857 A.2d 649

CENTEX HOMES, LLC, PLAINTIFF v. THE TOWNSHIP COMMIT-
TEE OF THE TOWNSHIP OF MANSFIELD, A POLITICAL SUB-
DIVISION OF THE COUNTY OF BURLINGTON AND THE
TOWNSHIP OF MANSFIELD PLANNING BOARD DEFEN-
DANTS (TWO CASES).

Superior Court of New Jersey
Law Division Burlington County

Decided June 4, 2004.

*Philip B. Seaton*, for plaintiff (*Blank Rome, LLP*).

*John C. Gillespie*, for defendant (*Parker, McCay & Criscuolo*).

SWEENEY, A.J.S.C.

On November 12, 2003, with the adoption of resolution no. 2003–11–8, the Mansfield Township Committee (Mansfield or Township) terminated a general development plan (GDP) previously approved by the Mansfield Township Planning Board (Board) for Centex Homes, LLC (Centex), formerly known as Calton Homes, Inc. in December, 1977. Five public hearings preceded the adoption of the resolution. The question presented in this action in lieu of prerogative writs is whether Mansfield had "good cause" for terminating the GDP. The issue of termination of a GDP has not been previously addressed by the courts of this state.

It is important to understand the factual and procedural history leading to the termination of the GDP.

Resolution 1997–12–17 was adopted by the Board on February 23, 1998, memorializing the action taken at the Board meeting on December 22, 1997, approving the GDP. It is that resolution that defines the general parameters of the GDP, makes factual findings and conclusions, and sets forth the terms and conditions of the

GDP approval pursuant to *N.J.S.A.* 40:55D–45.1. The proposed development was to be known as "Mansfield Crossing" and was to consist of 414 homes constructed in ten sections over a ten-year period on 478.13 acres. Petticoat Bridge Road bisects the project. To the east, 233 homes were proposed on two farms. One is the "Puglia" farm consisting of 68 acres. The other is the "Reed" farm consisting of 197 acres. The remaining parcel to the west of Petticoat Bridge Road is the "Carty" farm on which Centex proposed to construct 181 homes. The proposed development conformed to existing zoning requirements and "clustering" was allowed providing the total number of units did not exceed a density of 0.9 units per acre. Since the plan called for 414 units on 478 acres, the yield of .866 units per acre fell within the permitted density allowance. On the eastern portion of the development, access to the "Reed" parcel was to be through the "Puglia" piece which fronted on Petticoat Bridge Road directly across from the "Carty" farm.

Before granting approval of the GDP, the Board conducted four hearings. During those hearings the Board expressed several concerns. Among them was the suggested single access between the eastern and western portions of the development. The Board desired a second access. Centex, however, informed the Board that environmental concerns about wetlands prohibited a second access at the suggested point. As part of the GDP, Centex submitted eight plans: (a) a land use and open space plan; (b) a circulation plan; (c) an open space plan; (d) a conceptual utility plan; (e) a drainage plan; (f) an environmental inventory; (g) a housing plan; and (h) a community impact report. *N.J.S.A.* 40:55D–45.2. Among other proposals in the GDP, the project was to be served by public water and sewer via an agreement with the owners of an existing development known as "Homestead." That agreement also provided that 200 existing homes in the Old Village of Columbus would have access to sewer connections. Centex agreed to contribute $1,000 per unit to Mansfield to be dedicated to the construction of a sewer line to the village. The development was to have 216 acres of open space divided between

the eastern and western tracts. Centex would contribute $120,000 to the Township's affordable housing trust fund and contribute its fair share of the cost and improvement of local roads impacted by the development. Centex also agreed to make a cash contribution in lieu of sidewalks along Petticoat Bridge Road as well as $204,000 to the Township's recreation trust fund along with twenty-five acres of "upland open space." The resolution made clear that the GDP was only "a conceptual approval" and that "before any construction begins the Applicant must seek and obtain preliminary and final major subdivision approval for each section and phase of development . . . ."

On October 26, 1998, the Board granted GDP approval to Centex and adopted resolution 1998–9–12 for 413 lots, one less than contemplated in the original GDP. Of those, 232 lots were approved for the "Puglia" and "Reed" parcels and 181 for the "Carty" piece. In January, 1999, the Board granted final subdivision approval for section 1 to allow for construction of houses on thirty-six lots on the "Puglia" parcel. Then, in June 1999 Centex received final approval for Sections 7 and 8 on the "Carty" parcel. No further submissions to the Board were made until February 2003 when Centex submitted for approval a plan for sections 9 and 10 on the "Carty" parcel consisting of an additional eighty-nine lots.

Following the January 1999, final approval of section 1 on the "Puglia" tract, Centex engineers received a letter of interpretation (LOI) dated February 3, 1999 from the Department of Environmental Protection (DEP). This LOI referred to a previous LOI of September 3, 1997, in which the DEP found the wetlands on the "Puglia" tract to be of "intermediate and ordinary resource value." However, as the result of a site visit on February 1, 1999, the DEP advised that the "state endangered, federally threatened bog turtle (Clemmys Muhlenbergi)" had been located on the tract and that the DEP Principal Environmental Specialist who wrote the letter "will be recommending that the wetlands . . . be reclassified as being an exceptional resource value . . . and that a standard 150

foot buffer be required adjacent to these wetlands" rather than the fifty feet suggested in the September 3, 1997, LOI. Centex interpreted the LOI to be a mandated change to the project pursuant to *N.J.S.A.* 40:55D–45.5(b), and terminated all proposed development on the tract including the access road to the "Reed" parcel. This meant that the "Reed" parcel no longer had a direct connection to the "Carty" farm through the "Puglia" tract and across Petticoat Bridge Road. Following receipt of the LOI, Centex representatives met with representatives from the DEP in February and April 1999 at Joint Process Permitting (JPP) Meetings in which Centex alleges that the DEP "made it clear" that any Centex application for a road crossing through the "Puglia" tract would not be approved even though no formal decision on that issue was ever forthcoming from the DEP.

In early November, 2002, the "Puglia" farm which had been under contract of sale to Centex, was purchased by Burlington County pursuant to its Farmland Preservation Program. Development on the tract was thereafter forbidden pursuant to the deed of easement. On February 21, 2003, at a meeting between Centex and Township representatives concerning performance bonds and the application for approval of sections 9 and 10, among other items, Centex informed the Township that the "Reed" parcel would be developed with only forty-nine lots instead of 196 lots with private well and septic rather than public water and sewer.

On March 14, 2003, in reaction to that meeting, counsel for Mansfield prepared a memorandum to the Committee stating that the loss of the "Puglia" farm to the County, the elimination of access to the "Reed" parcel and the changes in development on the "Reed" tract expressed at the February 21, 2003, meeting had substantially altered the original GDP. He recommended notifying Centex that it would have "ten (10) days in which to give evidence that it is fulfilling its obligations pursuant to the Approved General Development Plan." The memorandum described the necessity for a hearing as outlined in *N.J.S.A.* 40:55D–7. A letter was thereafter sent to counsel for Centex on the same day incorporat-

ing the findings and conclusions contained in the memorandum. No response from Centex was forthcoming and on March 24, 2003, Centex withdrew its application for approval of sections 9 and 10. On March 26, 2003, the Township adopted resolution 2003–03–7 terminating the GDP. Thereafter, members of the Township Committee appeared at hearings on a Wastewater Management Plan proposed by Centex to the DEP and objected to it on the basis that the GDP had been terminated.

On April 23, 2003, Centex filed a verified complaint and order to show cause seeking an order compelling a hearing and vacating resolution 2003–3–7. Following discussions with the court, Mansfield agreed to grant Centex a hearing and the parties agreed upon a date of June 16, 2003. Prior to that hearing date, Centex filed a second verified complaint and order to show cause seeking to restrain the Township Committee from hearing the matter and appointing a hearing officer. Those forms of relief were denied in an order dated August 11, 2003. The hearing commenced on August 4, 2003, and ended on October 30, 2003, after five hearings. Finally, on November 12, 2003, the Township adopted resolution 2003–11–8 in which it terminated the GDP for the following reasons: (a) the elimination of the "Puglia" tract so materially altered the GDP that it alone is sufficient to revoke the protections afforded that plan in 1997; (b) the loss of free sewer service to the Village of Columbus; (c) the reduction of the number of lots from 413 to an unknown number contrary to the provisions of *N.J.S.A.* 40:55D–45.6(b) without the prior approval of the Planning Board; (d) reduction in open space; (e) a substantial variation in the time schedule of the ten-year build-out which affected the "absorption rates" impacting municipal services and schools; (f) relocation of access to the eastern portion of the project; and (g) reduction of recreation space from twenty-five to twenty acres and elimination of all recreation space on the "Carty" parcel. Finally, the Resolution rejected the argument of Centex that approval of an amended GDP was required by *N.J.S.A.* 40:55D–45.5 because of a "decision" of the DEP regarding the inability of Centex to develop the "Puglia" tract due to the presence of the bog turtle

habitat. The Resolution reflected the Committee's weighing of the testimony and documentary exhibits and expressed the Committee's reasoning for either accepting or rejecting testimony of witnesses. The Committee also determined that Centex "has never returned to the Planning Board" to discuss changes and seek amendments to its GDP. Next, the Committee expressed in the resolution its finding that the denial of Centex Waste Water Management Plan (WWMP) rendered Centex in violation of the GDP.

Thereafter, this second action was instituted by Centex and was consolidated by this court with the first action.[1]

The resolution concluded:

> that for the reasons set forth in this Resolution, as well as for other reasons articulated in the record before the Township Committee ..., the Township Committee hereby determines that Centex is in violation of the Approved General Development Plan, and that good cause exists to terminate same[.]

Centex argues that the Township has the burden of proving "good cause" to terminate the GDP by a preponderance of the credible evidence. Said another way, the local government, seeking to revoke a vested right, bears the burden of proving that Centex is no longer entitled to it and that the presumption of validity of the Township's action in terminating the GDP does not apply. The Township disagrees. It asserts that in this action in lieu of prerogative writs, in a land use case, the Legislature has delegated jurisdiction to governing bodies to determine whether good cause exists to terminate a GDP by virtue of the developer's violation of the plan and that the burden of proof is on the developer to show that the actions of the governing body were arbitrary, capricious or unreasonable. Centex contends that such a standard is inapplicable because Centex has vested rights. It also contends that the improper withholding of approvals by the county and the DEP have "prohibited" Centex from proceeding fully with its development and that such actions by those bodies

---

[1] No order for consolidation has been submitted as of the date of this opinion.

toll the time periods for protections pursuant to the Municipal Land Use Law (MLUL). Centex maintains that the only "good cause" a municipality can have for the termination of vested rights is proof that Centex is guilty of fraud or deceit, meaning an "active act of substantial malfeasance on the part of the developer," and that "Without that finding by the Township, there can be no good cause for revocation of a GDP and the vested rights attendant thereto." Centex accuses the Committee members of "[n]eeding just five minutes to write down what was certainly their pre-ordained decision," after hearing many hours of testimony and having more than 1600 documents to consider. Centex also claims bias and prejudice on the part of Committee members.[2] Centex also argues that even if it were proper for the Township to terminate its GDP, the final approvals it received for various sections of the GDP remain vested and valid. Finally, Centex contends that it was unable to return to the Planning Board for submission of an amended GDP because it did not have in place a WWMP for its amended proposal.

The Township summarizes its arguments essentially in the following heading in its brief:

V. WHERE A DEVELOPER HAS RECEIVED GENERAL DEVELOPMENT PLAN APPROVAL FOR A 414 UNIT RESIDENTIAL SUBDIVISION, AND OVER THE COURSE OF YEARS HAS NOT ONLY FAILED TO DEVELOP THE PROJECT, BUT ACKNOWLEDGES THROUGH THE COURSE OF A HEARING BEFORE THE GOVERNING BODY, THAT IT IS UNABLE TO COMPLETE THE PROJECT AS APPROVED, INCLUDING, AMONG OTHER THINGS, THAT ONE OF THE THREE TRACTS OF LAND FOR WHICH THE APPROVAL IS GRANTED IS NOW NO LONGER PART OF THE PROJECT BECAUSE OF ITS ENROLLMENT IN A COUNTY FARM LAND PRESERVATION PROGRAM; THAT THE TIMING SCHEDULE AGREED UPON HAS BEEN COMPLETELY IGNORED; THAT AGREEMENTS MADE BY THE DEVELOPER AS A CONDITION TO APPROVAL HAVE BEEN BREACHED; AND WHERE THE GOVERNING BODY LAYS OUT ITS FINDINGS IN A COMPREHENSIVE RESOLUTION, THE GOVERNING BODY'S FINDINGS ARE ENTITLED TO A PRESUMPTION OF VALIDITY

---

[2] The court declines to entertain this issue, having decided previously that the committee was the proper body to hear this matter. See the court's order of August 11, 2003.

AND LEGITIMACY, AND THE RECORD ITSELF REVEALS THAT IN-
DEED THE DEVELOPER HAS VIOLATED THE APPROVED PLAN.

In addition, the Township maintains that the final approvals for sections 7 and 8 on the "Carty" parcel and section 1 of the "Puglia" tract are rendered invalid because they were part of an invalid comprehensive plan and because the "Puglia" tract is no longer part of any plan.

I concur with the Township's arguments and reject those of Centex. In so doing, I affirm the termination of the GDP and find that the actions of the Township were not arbitrary, capricious or unreasonable, the standard I find applicable here, contrary to the beliefs of Centex. This is an action in lieu of prerogative writs. As such, any aggrieved party, in this case Centex, may appeal from the action of a municipal agency to the Law Division of the Superior Court. *N.J.S.A.* 40:55D–17(h) and 40:55D–18. Clearly, the termination of a GDP is a local land use decision, appeals from which are governed by *R.* 4:69–1 through 4:69–7. An appellant has the burden to show that the action of the municipal agency from which the appeal is taken was arbitrary, capricious or unreasonable. The record below is controlling and the municipal agency's decision should be sustained if supported by substantial credible evidence in the record. The court, however, is not bound by determinations of legal issues by the municipality. *El Shaer v. Planning Bd.,* 249 *N.J.Super.* 323, 592 *A.*2d 565 (App.Div.1991), *certif. denied* 127 *N.J.* 546, 606 *A.*2d 360 (1992); *Urban v. Planning Bd.,* 238 *N.J.Super.* 105, 569 *A.*2d 275 (App.Div.1990), *aff'd as modified on other grounds,* 124 *N.J.* 651, 592 *A.*2d 240 (1991).

I begin my analysis with a general examination of the statutory provisions governing GDPs. *N.J.S.A.* 40:55D–44.1 through 44.8 were enacted on May 28, 1987, more than ten years after the MLUL became law on August 1, 1976. *N.J.S.A.* 40:55D–45.1 states unequivocally: "The planned development shall be developed in accordance with the general development plan approved by the planning board ...". The tract or assemblage of tracts to

be developed must be greater than 100 acres, *N.J.S.A.* 40:55D–45.3, and developed in accordance with a timing schedule, modification of which cannot occur without approval of the planning board. *N.J.S.A.* 40:55D–45.4. Neither is there to be a variation in the location of land uses from the GDP without prior approval of the planning board, *N.J.S.A.* 40:55D–45.5(a), unless such variation shall occur as a result of or in reaction to a negative decision of, or condition of development approval imposed by the Pinelands Commission or the DEP. *N.J.S.A.* 40:55D–45.5(b). In that event, approval by the board shall be granted if "the developer can demonstrate, to the satisfaction of the planning board, that the variation being proposed is a direct result of such determination by the ... Department of Environmental Protection." *Id.*

*N.J.S.A.* 40:55D–45.6(a) provides that once a GDP has been approved, "it may be amended or revised *only* upon application by the developer approved by the planning board" (emphasis added). Part b of the statute allows a developer "without violating the terms of the approval," to reduce the number of proposed units by 15% or less. *N.J.S.A.* 40:55D–45.6(b).

Of final relevance to this case, *N.J.S.A.* 40:55D–45.7 (emphasis added) provides in pertinent part:

> ... if at any time the municipality *has cause to believe* that the developer is not fulfilling his obligations pursuant to the approved plan, the municipality shall notify the developer, by certified mail, and *the developer shall* have 10 days within which *to give evidence* that he is fulfilling his obligations pursuant to the approved plan. The municipality shall thereafter conduct a hearing to determine whether or not the developer is in violation of the approved plan. If, after a hearing, the municipality *finds good cause* to terminate the approval, it shall provide written notice of the same to the developer and the approval shall be terminated 30 days thereafter.

No New Jersey case has dealt with the issue of termination of a GDP in accordance with the provisions of *N.J.S.A.* 4:55D–45.7.

■ Prior to the five hearings conducted in this case by the Township Committee, two things clearly happened. First, it is undisputed that Centex's plans for development had changed dramatically. Secondly, the changes in the Plan were not ap-

proved by the Board. With that as a back drop, it is apparent to this court that the Township had the requisite statutory "cause to believe" that Centex was not then, nor would it in the future be, capable of fulfilling its obligations pursuant to the originally approved GDP. *N.J.S.A.* 40:55D–45.7. Centex has argued that "mere change" is an insufficient basis to terminate a GDP in the absence of fraud or deceit. The basis for the Township's "cause to believe" that Centex was not fulfilling its obligations consisted of the removal of the "Puglia" parcel from the plan. This alone was sufficient cause to enable the Township to require Centex to give evidence of its ability to continue in compliance with the GDP as approved by the Board. The elimination of that tract, whether or not through the fault of Centex, substantially altered the GDP because, in the words of the resolution, it "removed sixty-eight (68) acres and thirty-six (36) lots from the Project [and] also removed a substantial portion of the Project's open space requirements." (See resolution No. 2003–11–8, at pp. 3–4). Moreover, *N.J.S.A.* 40:55D–45.6(b) (emphasis added) states rather unequivocally that:

> A developer, *without violating the terms of the approval pursuant to this act,* may, in undertaking *any section* of the planned development, *reduce the number of residential units . . . by no more than 15%* or *reduce the residential density . . . by no more than 15%; . . .*

■ In January, 1999, the Board had given final subdivision approval to Section 1 (the "Puglia" parcel) for the construction of thirty-six houses. The balance of that parcel was to remain as open space. Removal of that entire parcel, whether by expiration of contract or by DEP action, or both, caused a 100% reduction of residential units and residential density in an entire section. That was a violation of the plan. Centex, however, contends that *N.J.S.A.* 40:55D–45.5 is implicated because its election to eliminate the "Puglia" parcel was in response to a "negative decision of" the DEP. This argument fails for two reasons. First, Centex failed to persuade the Planning Board that the "variation being proposed [was] a direct result of [a] determination by the . . . Department of Environmental Protection . . . ." *Ibid.* Centex did not even

return to the Board in an effort to demonstrate such DEP action. Furthermore, the LOI of February 3, 1999 was not a "determination" by the DEP. It was an *indication* that a representative of the DEP would recommend a reclassification of the wetlands that would have increased the buffer requirements from 50 feet to 150 feet. Second, Centex has failed to demonstrate that it could not have constructed the roadway connecting the "Reed" parcel through the "Puglia" tract or that it could not have constructed a lesser number of units on the "Puglia" piece as asserted by the Township. Rather, Centex chose to simply abandon the "Puglia" tract and attempt to proceed with development of an amended plan without returning to the Board for approval.

Centex's argument that it could not submit an amended GDP to the Board because it had not yet obtained from the DEP approval for a WWMP overlooks the very nature of the GDP. "Approval of such plan insulates the developer from certain subsequent changes in law for a period potentially much longer than would be achieved by preliminary and final site plan and subdivision approval alone. Compare *N.J.S.* 40:55D–45.1 and *N.J.S.* 45:55D–49. . . . approval does not insulate the developer from the requirement to get preliminary and final subdivision and site plan approvals."

[William M. Cox, *N.J. Zoning & Land Use Administration,* § 15–2 (2004)] A GDP is a plan that sets forth "the permitted number of dwelling units, the amount of non-residential floor space, the residential density and the non-residential floor area ratio for the plan development, *in its entirety* according to a schedule which sets forth the timing of the *various sections* of the development. *N.J.S.A.* 40:55D–45.1(a)." (emphasis added). It is approved for a specified term not to exceed 20 years, *N.J.S.A.* 40:55D–45.1(b), but it must receive preliminary and final site plan and subdivision approvals in accordance with other applicable provisions of the MLUL. In a sense, it is a "conceptual plan" as described in the Board's resolution approving the GDP. It is a general development plan, which when approved as such, enjoys protection against zoning changes for the number of years specified by the Board. No section of *N.J.S.A.* 40:55D–45.1 through 45.8 *requires* the developer, either initially or upon submission of

an amended GDP, to have in place a WWMP approved by the DEP. *N.J.S.A.* 40:55D–45.2(d) *allows,* but does not require, "a utility plan indicating the need for and showing the *proposed location of sewage and water lines, any drainage facilities* necessitated by the physical characteristics of the site, *proposed* methods of handling solid waste disposal and *a plan* for the operation and maintenance of *proposed utilities;* ..." (emphasis added). Consequently, I find that the argument advanced by Centex regarding its failure to obtain a WWMP as its reason for not returning to the Board as lacking merit.

In addition to the removal of the "Puglia" parcel from the GDP as originally approved, it became apparent during the hearing on October 30, 2003, that the Homestead Sewage Treatment Plant had not been upgraded and expanded. This, in itself, is significant because the GDP approved by the Board required Centex to provide sewer capacity in that facility to 200 homes in the Village of Columbus. The resolution approving the GDP provides rather specifically:

> "As a result of this Project, the residents in the Village of Columbus will benefit because the Applicant's agreement calls for Homestead to make sewer gallonage available for up to two hundred (200) homes in Columbus. The Applicant will contribute One Thousand Dollars ($1,000) per unit to the Township to be used for the construction of a sewer line to the Village of Columbus. Applicant shall also provide sewer capacity for approximately two hundred (200) home in the Village."

In its October 1, 2003, decision the DEP states that "[w]ithout an expansion of the STP, the contractual agreements which commit Applied Wastewater Management, the new owner of the Homestead Plant, to reserve capacity for two hundred (200) units in Columbus could not be honored."

Moreover, during the hearing before the Township Committee, Anthony DiLodovico, an engineer with the firm of Schoor and DePalma, testified for Centex that Centex needed sewer capacity for 181 units to be constructed on the "Carty" parcel and that there would be no sewer capacity remaining for the Village of Columbus.

■ Another change in the GDP involved a reduction in the amount of open space. Daniel McSweeney, a Centex planner, testified that although the original GDP called for 216.96 acres of open space, that it now proposed a reduction to 185.66 acres. As with the elimination of the "Puglia" tract, the Township Committee in its resolution terminating the GDP rejected the notion that its loss to the Farmland Preservation Program was responsible for the loss of open space. Furthermore, although there was testimony from Edward Brady that Centex would continue to provide twenty-five acres of active recreation space in addition to the passive open space, it became clear that, under the original GDP, recreation space was to be available on both the eastern and western tracts of the development. With the changes proposed by Centex, all of the recreation space would be on the "Carty" or western tract and none would remain on the larger eastern tract. Children would be required to cross over an even busier Petticoat Bridge Road from the west to gain access to the eastern recreation areas. Centex maintains that the "decision" of the DEP necessitated the reconfiguration of the recreation space. The Township Committee rejected that argument as do I. Not only would those seeking to use recreation areas on the eastern tract be required to cross Petticoat Bridge Road, they would be required to do so at a point 3,000 feet north of the location of the originally proposed connection between eastern and western tracts. In this regard, the Township Committee rejected the testimony of Bryon DuBois, a bog turtle habitat expert for Centex and accepted the testimony of Terry Vogt, P.E., of Remington and Vernick, who testified that a wetlands crossing through the "Puglia" tract could have been sought and obtained pursuant to DEP regulations without disturbing the bog turtle habitat. Finally, the assertion by Centex that it had no option other than moving the access point between the eastern and western tracts 3,000 feet to the north is diametrically opposed to its position before the Board when the original GDP was submitted for approval. At that time, Centex told the Board that a second access between the eastern

and western portions of the project was prohibited because of the presence of substantial wetlands.

One of the primary goals of the legislation allowing for extended protection for GDPs against changes in local zoning laws is to allow for a greater degree of certainty in respect of large scale developments to be phased in over an extended period of years. The Centex project was approved in December 1997 as a GDP. Approximately one year later, the first section of the plan received final subdivision approval. Nearly six and one-half of this ten-year plan have elapsed and not a single house has been constructed. In fact, no infrastructure improvements have been made. Any certainty contemplated by the Legislature and Governor has failed to materialize in this case. There is litigation instead of construction. The future of the "Reed" and "Carty" parcels is uncertain. Centex argues that even if it were proper for Mansfield to terminate the GDP, the final approvals for those portions of the GDP that have been granted are vested rights of the developer and are entitled to protection from invalidation by virtue of *N.J.S.A.* 40:55D–49 and –52. I disagree. The GDP is an integrated plan. Survival of a portion is dependent upon survival of a whole. This principle is substantiated in the wording of *N.J.S.A.* 40:55D–6(b). It is a violation of "the terms of the approval pursuant to this act" to reduce the number of residential units by more than fifteen percent in any section of the plan. If only a few sections of a multi-section GDP have received final approval and the remainder of the plan cannot be constructed and is terminated, those few cannot survive.

Centex attempted to amend its GDP in the hearings before the Committee. Only the Planning Board can hear and approve such amendments or changes. *N.J.S.A.* 40:55D–45.6(a). The GDP originally approved by the Board no longer exists. Only pieces of it remain. The action of the Township Committee in terminating the GDP was appropriate, good cause having been properly found. The action of the Committee was a far cry from being arbitrary, capricious or unreasonable. Under the totality of

the circumstances presented in this case, termination was mandated.

Counsel for the Township shall submit an order consistent with this opinion within seven (7) days.