929 A.2d 606 (2007)
395 N.J. Super. 434
CITIZENS UNITED TO PROTECT THE MAURICE RIVER AND ITS TRIBUTARIES, INC., Association of New Jersey Environmental Commissions, New Jersey Conservation Foundation and New Jersey Audubon Society, Plaintiffs-Appellants,
v.
CITY OF MILLVILLE PLANNING BOARD and Millville 1350, LLC, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 15, 2007.
Decided August 6, 2007.
*607 Carter H. Strickland, Jr. argued the cause for appellants (Rutgers Environmental Law Clinic and Columbia Environmental Law Clinic, attorneys; Mr. Strickland and Edward Lloyd, on the brief).
Richard H. Daniels, Millville, argued the cause for respondent Millville Planning Board.
*608 Douglas McCollister, Marlton, argued the cause for respondent Millville 1350, LLC (Parker McCay, attorneys; Ronald C. Morgan, of counsel; Mr. McCollister, on the brief).
Before Judges LISA, HOLSTON, JR. and GRALL.
The opinion of the court was delivered by
LISA, J.A.D.
Defendant, Millville 1350, LLC (Developer), applied to the City of Millville Planning Board (Board) for approval of a general development plan (GDP) with respect to a property consisting of 1,340 acres of which the Developer is the contract purchaser. The GDP proposed the construction of 950 detached age-restricted homes clustered on 239 acres and the construction of an eighteen-hole golf course and club house on 170 acres, with the remaining 930 acres to remain as undeveloped open space and to be permanently deed restricted as a conservation area. The Board conducted extensive public hearings, at which dozens of lay and expert witnesses testified. The Board also received voluminous expert reports. Plaintiffs are environmental organizations, and, represented by counsel, they fully participated in the proceedings before the Board.
The primary issue before the Board was whether the developer established "[t]hat the proposed planned development will not have an unreasonably adverse impact upon the area in which it is proposed to be established." N.J.S.A. 40:55D-45d; Millville Code § 30-70D. Much of the property is environmentally sensitive and is the habitat of six identified endangered or threatened animal species. In its approving resolution, the Board found that the evidence established that the proposed development will not have an unreasonably adverse impact upon the area. The Board set forth in the resolution its view that the legislation providing for GDPs was for the purpose of the increased flexibility desirable to promote mutual agreement between applicants and planning boards on the basic scheme of a planned development, and that in acting upon GDPs the matters required for consideration should be evaluated in a general way from the standpoint of probable feasibility, with the more detailed presentation being left until the more specific applications for preliminary site plan and subdivision approvals that will follow. Applying those principles and in consideration of its factual findings, the Board approved the GDP.
Plaintiffs filed an action in lieu of prerogative writs, alleging that the Board's action should be reversed because it was based upon insufficient information, was unsupported by adequate factual findings, imposed improper conditions, and was arbitrary and capricious. The parties filed cross-motions for summary judgment, which Judge Michael Brooke Fisher considered based upon the record developed before the Board.
After hearing oral argument, the judge issued a written decision. He determined that the Developer provided sufficient information to support the Board's determination that the development will not have an unreasonably adverse impact. Further, he agreed with the Board's interpretation of the statutory and ordinance provisions pertaining to GDP applications, namely that the information required may be of a general nature, and less detailed and specific than is ordinarily required in connection with subdivision and site plan applications, so long as the information provided is sufficient to support a determination whether the proposed development will have an unreasonably adverse impact upon the area.
*609 Judge Fisher was satisfied that the Board's finding in that regard was adequately supported by the record before the Board. He was also satisfied that the conditions imposed, which included more detailed submissions in the future, when site plan and subdivision applications would be filed, were appropriate and not contrary to State or local law. The judge accorded the Board's action a presumption of validity, found that plaintiffs failed to overcome the presumption, and concluded that the Board's action was not arbitrary, capricious or unreasonable. He therefore granted summary judgment in favor of the Developer and Board and denied plaintiffs' summary judgment motion. Accordingly, he dismissed the complaint.
On appeal, plaintiffs argue that the Board and trial judge incorrectly interpreted the "unreasonably adverse impact" standard, that the Board approved the GDP on an inadequate record, that the conditional approval of the GDP was contrary to law and invalid, and that the Board's resolution failed to make sufficient findings. We reject these arguments and affirm.

I
The 1,340 acre tract is presently owned by Conectiv, an electric utility company. Conectiv's predecessor, Atlantic City Electric Company, purchased a larger tract encompassing the 1,340 acres, subdivided a portion of the larger tract, and constructed an electrical substation on the subdivided portion. Conectiv has now determined to relinquish its ownership of the 1,340 acres. In 1999, the New Jersey Department of Environmental Protection (DEP) offered to purchase the property for $2,553,000 to be used for conservation and recreation purposes. The offer was declined, and the Developer contracted in 2002 for the purchase of the property for $4 million.
The property is in an outlying area, away from the developed portion of the City of Millville. It has frontage on Route 49 and is located near the intersection of Route 49 and Route 55, a major limited access State highway. City water and sewer are available to the property. The property is bordered on one side by the Menantico Creek and on the other by a branch of the Manumuskin River, both of which discharge into the Maurice River.
The property is not a virgin tract. It has been used over the years for mining gravel and sand, leaving behind large craters which have become ponds. A holly orchard has been planted, and, although abandoned, covers a large portion of the property. A conference center, which was unsuccessful in its intended purpose, remains on the property. The property also contains parking lots and other miscellaneous structures, as well as a former railroad bed and power line right-of-way. The property is regularly used, without authorization, by the operators of ATVs and other off-road vehicles. The property is not within the Pinelands and is not regulated by the Coastal Area Facility Review Act (CAFRA).
The zoning classification of the property is Land Conservation (LC). Planned adult community developments are permitted uses in the LC district, and golf courses are permitted accessory uses. Millville Code § 30-227A, C(2). "The purpose of a planned adult community development is to maintain the natural, rural and scenic qualities of the LC Land Conservation District by preserving sensitive environmental features and significant open lands while providing necessary housing opportunities for an aging population." Millville Code § 30-227A. A planned adult community requires a minimum area of 150 acres, must be serviced by city water and sewer, must contain sufficient uplands and *610 developable acres to support at least 150 housing units, and must conform with the City's affordable housing requirements. Millville Code § 30-227B. Open space requirements in such developments must be a minimum of fifty percent of the gross acreage, and at least thirty percent of the total area must be set aside as conservation areas. Millville Code § 30-227D(3)(a).
The ordinance requires that "[l]ots and structures shall be laid out to the greatest extent feasible so they are located on the least environmentally sensitive area of the site and in a manner which maximizes the preservation area for long term conservation." Millville Code § 30-227E(1) (emphasis added). A minimum 150 foot buffer zone is required between residential and environmentally sensitive areas. Millville Code § 30-227E(3).
In the GDP, the Developer proposed development in eight phases over a ten-year period. The clubhouse, golf course and utilities would be constructed first, after which 113 to 145 units would be built in each phase. In preparation for the application process, the Developer hired an environmental expert, Robert Zappalorti, of Herpetological Associates, Inc. (H.A.). Zappalorti is recognized by all involved in this case, including plaintiffs and their experts, as a highly knowledgeable and reputable environmental expert, who has worked extensively with environmental organizations and the DEP. Zappalorti will occasionally work with a developer if he is satisfied that the developer is committed to sound environmental planning. Indeed, Zappalorti was recommended to the Developer in this case by the Executive Director of the New Jersey Chapter of the Nature Conservancy.
Zappalorti and H.A. are thoroughly familiar with the property that is the subject of this case and the surrounding area, having studied it and collected extensive data for more than twenty years. H.A.'s March 13, 2003 report consists of about fifty pages, exclusive of appendices. It contains a detailed description of the property, describes the methods used in evaluating the property, and sets forth results and recommendations. The report verified the existence on the property of two endangered species, the Pine Barrens treefrog and corn snake, as well as four threatened species, the pine snake, Cooper's hawk, barred owl and red-headed woodpecker. Critical habitat areas were identified and defined, and the report opined that they will be protected by appropriate buffers. The report set forth a series of recommendations as follows:
1. No development should take place within the Wild and Scenic Rivers Buffer Zones.
2. No construction of housing units or the golf course should take place within any delineated wetlands, or their wetland buffer zones.
3. All development shall comply with NJDEP's wetland regulations.
4. Whenever possible, all proposed housing should be clustered and not located within any areas of critical wildlife habitat.
5. The 18 hole golf course should be located in areas that are not critical or important wildlife habitat (i.e., nesting areas or winter dens).
6. Wherever possible, golf course plants and grasses should be local, native species, or non-invasive ornamental species.
7. Whenever possible, limited clearing of native trees and underbush should be the policy.
8. If possible, all large specimen trees should be preserved on the Conectiv property.

*611 9. Educational information packets and fact sheets should be distributed to future residents which explain about what wildlife they may see in their backyards and provide photographs of them. It should also tell residents how to identify local endangered or threatened species, and most important  Not to kill snakes.

10. Prior to, during forest clearing, and during actual construction a wildlife collection and translocation program should be initiated, so that animals are not accidentally killed by construction activities.
The report expressed the opinion that a suitable habitat management plan could be developed in conjunction with the proposed development "that protects the critical habitats of the threatened and endangered wildlife species found on the property," in accordance with certain requirements applicable to the adult community and golf course and encompassing other habitat enhancement or conservation actions. These are set forth in detail in the report. They include, for example, the use of wildlife culverts or tunnels under roadways, clustering of housing outside of critical wildlife habitat areas with minimum wetland buffers of 150 feet, use of native shrubbery and grasses in backyards, use on the golf course of only non-toxic, animal friendly chemicals, use of water conservation measures for the golf course, including the construction of artificial lakes and ponds that will act as lined basins to hold water for irrigation (which has been successful at another area golf course with a similar environment), the use on the golf course of native grasses, shrubs and wildflowers to serve as significant habitat enhancements and sources of food and nectar for wildlife, and the like. The other habitat enhancement or conservation actions included, for example, the construction of artificial snake dens, the funding of ongoing wildlife monitoring and pine snake radio tracking studies, and similar measures, such that "[a] smart `Habitat Conservation Plan' for the Conectiv property will ensure the protection of critical habitat for all endangered and threatened wildlife species that naturally occur there."
In his testimony before the Board, Zappalorti made clear his opinion that although the entire tract could be characterized as foraging habitat, the portion of the tract proposed for development was not critical habitat. He said:
Foraging habitat occurs everywhere. Snakes come and forage in people's backyards, because there's mice in people's backyards. Critical habitat is where these snakes are over winter, it keeps them from freezing and where they nest and lay their eggs. That's critical habitat.
Another critical habitat would be where a gravid female will bask just before laying eggs, and they usually bask very close to their nesting area, or some snakes congregate to shed their skin. So shedding snakes is important to the habitat.
But foraging habitat, that's everywhere. Everything you see on that map is foraging habitat, except for the middle of the mining pond. That's where they're strung across, but they don't forage there.
Zappalorti acknowledged during his testimony that the DEP considers foraging habitat to be a critical habitat "for certain species." That did not alter his opinion with respect to the species involved here.
In addition to its regular professional staff, the Board engaged an environmental consultant, Antoinette Sapio, for assistance in considering this application. The Board conducted hearings on August 16, September 15 and October 4, 2004. H.A. issued *612 supplemental reports dated July 13, 2004 and September 13, 2004, addressing specific concerns and issues raised by Sapio and experts affiliated with plaintiffs. After addressing in detail the issues raised, H.A.'s July 13, 2004 report stated that more than ninety-six person hours were spent in the field conducting follow-up studies in May, June and July 2004. H.A. reported that no additional endangered or threatened species were found, and again concluded that "[n]o important or critical wildlife habitat will be lost or adversely impacted as a result of this proposed clustered active adult housing project and 18 hole golf course." The September 13, 2004 report, after addressing item-by-item the issues presented by various individuals, concluded that the development "will not have a long-term adverse impact upon the Menantico Creek and Manumuskin River wetland systems. Likewise, no critical habitat of [endangered and threatened] plant and wildlife species and their ecosystem will be fragmented or lost if our various recommendations are followed."
In addition to the environmental studies and testimony, the Developer also presented a stormwater management assessment prepared by Maser Consulting P.A. The Maser report described the existing characteristics of the property and its topography, in which three drainage areas exist. The report provided that the proposed stormwater system would be designed in accordance with guidelines and regulations promulgated by nine listed governmental agencies at the local, State and federal levels. The report proposed that the residential area of the development "be constructed along with an underground stormwater collection system and a series of swales and detention basins." Because of the size of the site, it is subject to the "Stormwater Management Requirements set forth by the New Jersey [DEP] (NJDEP 7:8)." The New Jersey Stormwater Best Management Practices Manual prescribes non-structural strategies to be incorporated into the stormwater management design. These include ground water recharge, where possible, and stormwater quality and stormwater quantity standards, which are established by the Rules for major land development projects and which are met by incorporating nine specific non-structural stormwater management strategies into the project's design where practicable. Those nine strategies are listed. The report concludes that the proposed development "will be designed in order to minimize the impacts of construction with respect to the stormwater runoff from the site" and that the required "nonstructural stormwater management strategies will be incorporated in the project's design to the maximum extent possible."
In this regard, H.A. reported that "[t]he golf course will have a closed irrigation system and limited fertilizers and chemicals will be used to treat the greens and fairways, thus reducing secondary impacts which [i]s also a major concern of the environmental groups."
The position expressed by plaintiffs, through their experts and other representatives, can generally be described as arguing that the work performed by H.A. was informative but incomplete, that insufficient study was performed regarding ground and surface water effects, on and off site, that the entire tract constitutes critical habitat for the endangered and threatened species present, and that, without further proof of the absence of unreasonably adverse impact, no development should be allowed.

II
The Board accepted H.A.'s reports and studies, as supplemented by Zappalorti's testimony. The Board's environmental *613 consultant and other professionals recommended approval. The Board concluded that all issues raised were adequately addressed by the Developer. The Developer, although proposing a ten-year construction period, sought a twenty-year vestiture period. The Developer and City had entered into a developer's agreement, which provided for the payment by the Developer to satisfy affordable housing obligations of more than $1 million to be paid to the City for funding a Regional Contribution Agreement. The Board deemed the GDP application complete and concluded that it satisfied all requirements of its ordinance and the applicable provisions of the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163.
In its approving resolution, the Board found that the Developer would provide a habitat conservation plan to minimize impact on wildlife and vegetation in the proposed developed portion of the property. The Board further found that the Developer would provide a turf management plan for the golf course and other appropriate areas of the development which would, at a minimum, contain "the requirements of the New Jersey Pesticide Control Code (N.J.A.C. 70:30-1, et seq.)." With respect to the endangered species on the property, the Board found that "[n]o important or critical wildlife habitat will be lost or adversely impacted as a result of this proposed clustered active adult housing project and 18 hole golf course. Environmentally sensitive planning will help protect the six endangered and/or threatened wildlife species, and their critical habitats." The Board further found that an open space plan should be prepared in conjunction with the habitat conservation plan.
The Board also made other findings with regard to traffic design, financial responsibility, and other subjects which are not pertinent to this appeal, and was satisfied that all local and State requirements were met in those regards.
Finding no unreasonable adverse impact upon the area, the Board approved the GDP, subject to various conditions, including those challenged in this litigation.

III
As we view it, the principal issue in this appeal involves the standard by which a planning board evaluates a GDP. The MLUL, effective in 1976, contained a provision for planned developments, which required certain findings by the planning board, including "[t]hat the proposed plan will not have an unreasonably adverse impact upon the area in which it is proposed to be established." N.J.S.A. 40:55D-45d. In 1987, the Legislature supplemented the provision by providing for GDPs. See L. 1987, c. 129. A GDP is defined as "a comprehensive plan for the development of a planned development." N.J.S.A. 40:55D-4. The applicable substantive provisions for GDPs are codified at N.J.S.A. 40:55D-45.1 to -45.8.
A GDP must set forth the permitted number of dwelling units, the amount of nonresidential floor space, the residential density, and the non-residential floor area ratio for the planned development, in its entirety, according to the proposed schedule for various sections of the development. N.J.S.A. 40:55D-45.1a. "The planned development shall be developed in accordance with the [GDP] approved by the planning board," notwithstanding any provision of the MLUL or a local ordinance adopted after the effective date of the approval of the GDP. Ibid. The developer is protected from zoning changes for a period to be set by the planning board, not to exceed twenty years from the date upon which the developer receives final approval for the first section of the *614 planned development. N.J.S.A. 40:55D-45.1b.
A GDP may include additional non-exclusive items, namely a general land use plan, circulation plan, open space plan, utility plan, stormwater management plan, environmental inventory, community facility plan, housing plan, local service plan, fiscal report, more particular terms of the proposed timing schedule, and a municipal development agreement. N.J.S.A. 40:55D-45.2a to 1. Ibid.
Further, the MLUL authorizes ordinances requiring approval by the planning board of subdivision or site plans to include provisions for planned developments, "[a]uthorizing the planning board to grant general development plan approval to provide the increased flexibility desirable to promote mutual agreement between the applicant and the planning board on the basic scheme of a planned development and setting forth any variations from the ordinary standards for preliminary and final approval." N.J.S.A. 40:55D-39c(1) (emphasis added).
Millville's land use ordinance provides for planned unit developments. It provides that "[t]he approval process begins with the submission of a complete [GDP]." Millville Code § 30-65. The ordinance then provides, tracking the MLUL definition in N.J.S.A. 40:55D-4, that a GDP "shall comprise a comprehensive plan for the development of a planned development." Ibid. The ordinance further provides that a GDP shall include an enumerated list of elements, which the MLUL lists in N.J.S.A. 40:55D-45.1a to 1 as permissive. Millville Code § 30-66A to L.
With respect to the environmental issues implicated in this appeal, we take particular note of specific language included in the cognate provisions of the MLUL and Millville ordinance. The general land use plan must specify "general" locations of land uses. N.J.S.A. 40:55D-45.2a; Millville Code § 30-66A. The open space plan must show the "general" location of parks and other land area set aside for conservation and recreational purposes and a "general" description of improvements to be made on that land. N.J.S.A. 40:55D-45.2c; Millville Code § 30-66H. The stormwater management plan must set forth the proposed "method" of controlling and managing stormwater. N.J.S.A. 40:55D-45.2e; Millville Code § 30-66I. The environmental inventory must include a "general" description of the vegetation, soils, topography, geology, surface hydrology, climate and cultural resources of the site, existing man-made structures or features and the "probable" impact of the development on the environmental attributes of the site. N.J.S.A. 40:55D-45.2f; Millville Code § 30-66D.
These provisions support the Board's interpretation that the entire GDP process is intended to be general in nature and to provide the increased flexibility desirable to promote mutual agreement between a developer and planning board regarding the basic scheme of a planned development, and that such matters should be considered in a general way, from the standpoint of probable feasibility, with more detailed presentation deferred until the subsequent applications for preliminary site plan and subdivision approvals.
The plain language in the statutory scheme supports this interpretation. And, it would be illogical for the Legislature to add to the required subdivision and site plan review procedures another preliminary layer of review that contained equally stringent standards and requirements. We also find that this interpretation is supported by the legislative history underlying the 1987 amendments. In issuing a *615 conditional veto of the legislation, Governor Kean stated:
The bill would amend and supplement the Municipal Land Use Law to authorize municipalities to enter into general development plans for planned developments of more than 100 acres. A general development plan would precede preliminary subdivision plat or preliminary site plan approval and, if approved by the municipality, would have vested rights against subsequent changes in municipal ordinances.
The purpose of this bill in permitting large-scale developers to obtain vested rights is acceptable given the expenditures they plan to make over the course of several years in development of their property. Unfortunately, the technique utilized by this bill is not consistent with the scheme set forth in Municipal Land Use Law now in force in New Jersey.
. . . .
The amendments I recommend in this message provide for vested rights for general development plans upon approval by the planning board in accordance with ordinance provisions adopted by the governing body under the Municipal Land Use Law. Approval would be granted by the planning board consistent with the master plan and the zoning ordinance. Thus, my recommendations strengthen this bill by permitting vested rights for certain large-scale developers consistent with the scheme that now exists in the Municipal Land Use Law. [Governor Thomas H. Kean, Conditional Veto to Senate Bill No. 2966(OCR) (Apr. 27, 1987).]
A news release issued by the Governor's office upon signing the legislation stated:
Governor Thomas H. Kean today signed legislation permitting municipalities to enter into development agreements with large scale developers.
Governor Kean had conditionally vetoed the legislation on April 27 in order to make such agreements consistent with the Municipal Land Use Law.
Governor Kean stated, "My recommendations strengthen this bill by permitting vested rights for certain large-scale developers consistent with the scheme that now exists in the Municipal Land Use Law."
This legislation will allow for predictability in the development process so that a developer could rely upon the planning and zoning ordinances in effect at the time of the agreement for the duration of the building project.
[Office of the Governor, News Release (May 29, 1987).]
The Legislature recognized that developers of large-scale projects that would take many years to complete had a legitimate need for protection from zoning changes that were not adequately covered by the subdivision and site plan protections in the MLUL. The Legislature recognized that before a developer should be required to go through the costly efforts required to obtain preliminary subdivision or site plan approval, section by section, a comprehensive mechanism should be provided to obtain local approval of the overall intended plan, with long term protection from zoning changes, and to facilitate an agreement between the developer and municipality regarding many aspects of that plan, including a timetable, affordable housing requirements, and, of course, the scope and plan of the development itself. Obviously, at this early stage, considerations would be of a more general nature, as reflected in the language of the legislation. See also Centex Homes v. Twp. of Mansfield, 372 N.J.Super. 186, 199, 857 A.2d 649 (Law Div.2004) (stating that "[i]n a sense," a GDP is a "conceptual plan"). *616
It is apparent from the Governor's veto message and from the overall structure of the 1987 amendments that the GDP procedure was intended as a precursor to subdivision or site plan application, it was optional with the developer as a means of giving the developer protection against future zoning changes for large-scale multi-year development proposals, and it was designed to provide for general considerations and flexibility, so long as they were sufficient to satisfy the local planning board that the proposed development complied with local zoning requirements and would not cause an unreasonably adverse impact on the area. See also Eastampton Ctr., LLC v. Planning Bd. of Eastampton, 354 N.J.Super. 171, 176-77, 805 A.2d 456 (App.Div.2002) (describing the legislative history).
We are unpersuaded by plaintiffs' argument that because the MLUL already contained a provision allowing for "informal review," see N.J.S.A. 40:55D-10.1, the GDP procedure cannot be construed as a preliminary informal review of a "concept plan" because it would be duplicative and superfluous. It is clear to us that the informal review procedure cannot be equated with the much more involved and extensive GDP procedure which requires certain findings for approval and which carries the consequences of long term protection for a developer. We find no inconsistency or duplication in these provisions.
A leading commentator on New Jersey land use law has described the GDP legislation and its purpose this way:
The purpose of the legislation providing for General Development Plans was generally to provide the increased flexibility desirable to promote mutual agreement between the applicant and the Planning Board on the basic scheme of a planned development. See N.J.S. 40:55D-39. Although N.J.S. 40:55D-45.2 specifies those matters that must be considered by the Planning Board in acting upon an application for general development plan approval, which are practically identical with factors to be considered in connection with all subdivision and site plan applications, such matters are to be considered in a general way from the standpoint of probable feasibility, with the more detailed presentations being left until the more specific application for preliminary approval is sought.
Generally, GDPs are submitted for tracts considerably larger than 100 acres, as for example, a proposed resort in Vernon Township which contained 2,000 acres and which was planned to be developed over a 10 to 15-year period. While the developer could have submitted piecemeal plans for each portion of the development, both the developer and board benefited from the submission of the overall plan for the entire development. Moreover, the general timing of each phase of the development can be submitted which is a distinct advantage for municipal planning. Note that a developer who obtains approval of a general development plan must submit for each section or phase a conventional application for either subdivision or site plan approval, whichever is applicable, for each phase of the development. The submission of the first phase is required to be made within five years. N.J.S. 40:55D-45.7b.
The developer customarily enters into a municipal development agreement as provided for in N.J.S. 40:55D-45.2(1), setting forth the undertakings of the developer, the timing schedule, and providing in detail for various aspects of the development. . . .
N.J.S. 40:55D-45.1 sets out the matters which must be covered by a GDP. *617 N.J.S. 40:55D-45.2 sets out those which may be covered and makes clear that additional matters, not specified in the section, may also be part of a particular plan. Note, however, that where a GDP does not cover matters required to be part of a site plan or subdivision application, these would still be required as part of the latter applications. Thus, for example, while it is optional under N.J.S. 40:55D-45.2e that the developer include a storm water management plan, such a plan would be required under N.J.S. 40:55D-38b(3).
[Cox, New Jersey Zoning and Land Use Administration § 16-2.2 at 385 (2007).]
We conclude that the Board correctly considered the various elements in a general manner, but with a view to determining whether, so considered, those elements would establish that the proposed development would not result in an unreasonably adverse impact upon the area. We are also satisfied that the Board's factual findings, as set forth in its resolution, were sufficiently articulated and were supported by substantial credible evidence in the record before the Board. Lang v. Bd. of Adj. of North Caldwell, 160 N.J. 41, 58-59, 733 A.2d 464 (1999). It is presumed that local officials, familiar with local conditions in their community, were best equipped to make the required determination in this land use case and that they acted fairly and with proper motives in doing so. Kramer v. Bd. of Adj. of Sea Girt, 45 N.J. 268, 296, 212 A.2d 153 (1965). Courts may not second guess local land use bodies, but will uphold their determinations if they are factually based and not arbitrary, capricious or unreasonable. Ibid.
Applying these principles, we are satisfied that the Board had before it more than ample evidence and information to make an informed decision that the development would not have an unreasonably adverse impact upon the area and that its finding in that regard was based upon substantial credible evidence in the record. We are therefore satisfied that the Board's action was not arbitrary, capricious or unreasonable and we have no occasion to interfere.
This brings us to the final argument presented by plaintiffs, namely that the conditions included in the approving resolution were unlawful, thus rendering the approval invalid. Plaintiffs rely upon Field v. Township of Franklin, 190 N.J.Super. 326, 332, 463 A.2d 391 (App. Div.), certif. denied, 95 N.J. 183, 470 A.2d 409 (1983), for the proposition that the Board lacked statutory authority to condition the GDP approval on future submissions of "additional information fundamental to an essential element of the development plan." Based upon this theory, plaintiffs argue that conditions allowing for later submission of a stormwater management plan, turf management plan, and habitat conservation plan deprived the Board in acting on the GDP application of vital information that was necessary to make the required determination of no unreasonably adverse impact. We do not agree.
As we have explained, at the GDP stage, a more general type of information might be sufficient to establish no unreasonably adverse impact with respect to a particular subject matter, whereas, at a later stage, namely subdivision or site plan review, detailed engineering data will be required. Indeed, until specific design is undertaken, it is impossible to conduct detailed engineering analysis.
The Board was satisfied here that the information provided was sufficient to establish no unreasonably adverse impact due to stormwater management issues, surface and ground water issues, habitat *618 conservation issues, and the like, and that more detailed plans would be furnished over the long term of this development process.
The Board did not deem these more detailed plans "fundamental" to its no unreasonably adverse impact determination. We agree. The information provided on these subjects was in compliance with the requirements of N.J.S.A. 40:55D-45.2 and the cognate provisions of the local ordinance, Millville Code § 30-66. The information provided was from highly qualified and reputable sources and was comprehensive in nature. We agree with Judge Fisher that this information was sufficient, if deemed so by the Board, to make the determination required on a GDP application.
Affirmed.