959 A.2d 866 (2008)
403 N.J. Super. 531
ZRB, LLC, Petitioner-Appellant,
v.
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, LAND USE REGULATION, Respondent-Respondent.
DOCKET NO. A-6046-06T3
Superior Court of New Jersey, Appellate Division.
Argued September 29, 2008.
Decided November 17, 2008.
*868 Richard M. Hluchan argued the cause for appellant (Ballard Spahr Andrews & Ingersoll, attorneys; Mr. Hluchan, of counsel and on the brief; Robert S. Baranowski, Jr., Voorhees, on the brief).
Lisa G. Daglis, Deputy Attorney General, argued the cause for respondent (Anne Milgram, Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Ms. Daglis, on the brief).
Before Judges WINKELSTEIN, GILROY and CHAMBERS.
The opinion of the court was delivered by
WINKELSTEIN, P.J.A.D.
The threshold issue presented in this appeal is whether the New Jersey Department of Environmental Protection (DEP) has the authority under the Freshwater Wetlands Protection Act (the Wetlands Act), N.J.S.A. 13:9B-1 to -30, and the New Jersey Endangered and Nongame Species Conservation Act (the New Jersey Endangered Species Act), N.J.S.A. 23:2A-1 to -13, to designate and protect threatened as well as endangered species.
Appellant ZRB, LLC, the owner of a tract of land in Middle Township, Cape May County, appeals from a final decision of the Commissioner of the DEP denying its application for a Statewide General Permit No. 6 (the No. 6 permit) to fill wetlands and build a sixteen-lot single-family subdivision on its property. The Commissioner denied the permit on the ground that the wetlands were of exceptional resource value because they were habitat for the barred owl, a species the State has designated as threatened. N.J.A.C. 7:25-4.17.
On appeal, appellant makes two primary arguments: (1) that the DEP lacks the statutory authority to designate and protect threatened species; and (2) that the Commissioner's decision denying appellant's application was arbitrary and capricious.[1] *869 We reject appellant's arguments and conclude that the DEP has the authority to designate and protect threatened as well as endangered species and it correctly exercised that authority in denying appellant's application for a permit. Accordingly, we affirm the Commissioner's decision.

I

A. The Site
Appellant's lot is approximately 32.5 acres with frontage on Goshen-Swainton Road. A single-family residence, with a driveway and garage, is located in the center of the site, and an irrigation pond is on the northeast portion.
The property is comprised of isolated freshwater wetlands, wooded uplands, and open mowed herbaceous fields. The vegetation is primarily comprised of wooded areas with a forest canopy and clearing associated with the six isolated wetland areas on the site, designated as areas A, B, C, D, E/F, and G, each measuring about 150 to 200 feet across. Those wetlands are a component of an extensive wetlands area, bounded by Lizard Tail Swamp and approximately 333 acres owned by the Nature Conservancy to the south, and by the Timber Beaver Swamp Wildlife Management Area to the north.
On the northern boundary of the site, a small lot has been developed for use as a veterinary office, with a parking lot that can accommodate twenty-five to thirty cars. Opposite the site, on the northern border, seven or eight single-family homes are located with frontages on Goshen-Swainton Road. One of those residences serves as an automobile repair shop. Most of the land immediately north of the site is contiguous, undeveloped forested land, although approximately a quarter of a mile from the site, to the northeast, a single-family subdivision of eleven homes has been constructed.
Adjacent to the site, on the southeastern edge, about 180 feet from the site, is a 256-foot-high communications tower, which is supported and surrounded by a system of guide wires that span 170 feet from its base. A steady, low-intensity red light is located on top of the tower. To the east of the tower, immediately adjoining the site boundary, are railroad tracks on a New Jersey Transit right-of-way used by the Cape May Seashore Line. All-terrain vehicle (ATV) tracks run along the railroad right-of-way.
To the west of the property is a seasonal campground, open from the spring through the fall, offering approximately 400 sites for tent, trailer, and mobile home camping. Some mobile homes remain on the site year-round. The campground also contains recreational facilities, a camp store, a maintenance shop, and an office.
In May 2002, responding to an inquiry from appellant regarding occurrences of rare species on the site, the DEP replied that from 1984 to 1999, its Natural Heritage Database had recorded three sightings of the barred owl, a designated threatened species, in the vicinity of the site: one in 1984, in the Timber Beaver Swamp Wildlife Management Area, north of the site; another in 1995, on Goshen Road, approximately 7000 feet south of the site; and a third in 1999, also on Goshen Road, approximately 5000 feet south of the site.

*870 B. The Permit Application
On December 12, 2002, appellant submitted an application pursuant to N.J.S.A. 13:9B-23(b) for a No. 6 permit and a transition area waiver to fill approximately three-quarters of an acre of isolated wetlands to construct a sixteen-lot single-family residential subdivision. The No. 6 permit authorizes a property owner to fill a limited area of freshwater wetlands, provided that the wetlands are not of exceptional resource value. N.J.S.A. 13:9B-23(b). Appellant's plan was based on the premise that the wetlands would be classified as freshwater wetlands of intermediate resource value, requiring a smaller transition area buffer.
On April 28, 2004, the DEP issued a Letter of Interpretation (LOI) accepting appellant's delineation of the six wetlands on the site, but classified wetlands A, B, D, E/F, and G, as wetlands of exceptional resource value, and wetlands C as freshwater wetlands of intermediate resource value. The DEP noted that wetlands B, D, and E/F appeared to also meet the requirements for certification as vernal habitats.[2] On that same date, the DEP issued a letter denying appellant's application on the grounds that the wetlands were of exceptional resource value and constituted vernal habitat. The DEP classified the property as wetlands of exceptional resource value based on the presence of the barred owl; as well as on the presence of the eastern tiger salamander and the southern gray treefrog, both designated endangered species.
Appellant appealed, and the contested case was referred to the Office of Administrative Law, where a hearing was held before an Administrative Law Judge (ALJ) over four days from June to December 2006. The parties stipulated that, given the Supreme Court's decision in In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 494, 852 A.2d 1083 (2004), holding that the DEP rules prohibiting activities under a No. 6 permit in a vernal habitat exceeded the DEP's statutory authority, the vernal habitats could no longer be considered a basis for the DEP's denial of appellant's application. The parties also stipulated that the property was not a suitable habitat for the eastern tiger salamander and the southern gray treefrog, and thus the evidence during the hearing focused solely on the barred owl.

C. Expert Testimony
Joseph Lomax, appellant's expert in threatened and endangered species, testified that the wetlands were not suitable habitat for the barred owl. His environmental firm had conducted an extensive field survey, over a four-year period, using protocols established by the DEP regarding the barred owl, which is a shy, nocturnal species that is most active and territorial from April to June when the owls nest and raise their young. The protocols provided that the "[e]ntire State is considered within this species range," with "[m]ajor populations" located in the "large swamp complexes in Cape May and Cumberland Counties." With regard to suitable habitat, "[b]arred owls are known to occur in both upland and wetland habitats with home ranges typically composed of a mosaic of upland and wetland areas. Suitable habitats are generally described as large tracts of either hardwoods, softwoods, or mixed stands."
Barred owl habitats in southern New Jersey are "primarily associated" with three habitat types: Atlantic white cedar swamp; pitch pine lowland habitat; and *871 hardwood swamp. The cedar swamp and pitch pine habitats feature "typical understory vegetation," including highbush blueberry. The overstory tree species in the hardwood swamps include sweet gum, black gum, and red maple. The protocols also provide that "[h]uman disturbance and structures impact the suitability of forested habitat for the barred owl," although owls had been found in a suburbanized area in Atlantic County, and near a single-family dwelling in Warren County.
Using those protocols, Lomax and his son, appellant's expert in wetlands and wetlands habitat, surveyed the property approximately forty-six times, primarily during the months of April, May, and June, and found no physical evidence of barred owls on the site. During the day, they looked for evidence that barred owls utilized the site, but they found no owls, nests, or owl pellets. At night, in accordance with the protocol requirements, they played a series of tape-recorded barred owl vocalizations at various locations on the site in an attempt to elicit vocal responses from the owls. The protocols provide that "[w]hile barred owls may respond to tape calls during any month of the year, greater success has been documented during March-July." On July 29, 2003, the Lomaxes heard a pair of barred owls in the wetlands to the south of the site. Lomax said that they unsuccessfully tried to lure the owls onto the site by continuing to play the recorded vocalizations. On July 31, 2003, they heard a single barred owl to the south of the site, but at no time did the owl come within 200 feet of the site.
In 2004, Lomax was unable to elicit any responses to the taped barred owl calls. He nevertheless confirmed that the species was active at that time by surveying two control sites: the Timber Beaver Swamp Wildlife Management Area to the north and the Lizard Tail Swamp to the south. In 2005 and 2006, the Lomaxes elicited a response from a barred owl located south of the site, but they could not lure the owl onto the site. Lomax concluded that he was unable to lure the owls onto the property because, although the areas to the north and south of the site constituted suitable habitat for barred owls, the owls were not breeding or foraging on appellant's property.
Lomax opined that appellant's property lacks the physical characteristics normally associated with barred owl habitat, and the level of surrounding human activity has created a degree of disturbance that precludes any use of the property by the species. He explained that human activity and increased noise disturbance in the area around the sitecommercial activity, road, trains, and ATV'shad deterred the species from utilizing the site as a habitat. The camp site, located to the west of the property, was most active during the spring and summer when the owls breed and raise their young.
Lomax explained that the barred owl prefers to breed in large wetland areas, containing trees that are generally twenty inches in diameter or larger, conditions found on the large wetland areas located north and south of the site. In comparison, the trees on appellant's property were not very large, and the wetland areas were relatively small and fragmented, rendering the property unsuitable as a breeding habitat. He maintained that the DEP's landscape mapping of documented barred owl habitat was inaccurate in that it included developed areas not suitable for barred owl habitat, and failed to consider geographic features that may limit the owl's home range. He further testified that a barred owl will broadly defend its breeding territory, and thus he would have been able to lure the owls onto appellant's property if the owls used the property for *872 foraging or "roosting habitat." Because appellant's site was fragmented, the barred owls would avoid the site in favor of the more desirable, extensive undeveloped areas located in close proximity to appellant's site.
Lomax admitted, however, that barred owls can use up to 2400 acres of land, and they are known to travel two miles within their home range. He further acknowledged that he had not heard any trains on the adjoining tracks during the sixty-five to seventy cumulative hours he spent investigating the site, nor did he know how frequently the tracks were used. He did, however, frequently hear ATV's operating on the right-of-way.
John Heilferety, the DEP's expert in vernal pool and freshwater wetlands resource value classifications, conducted a vernal habitat analysis using data compiled during site inspections by DEP staff as documented on "Vernal Pool Data Sheets" and on aerial photographs. The DEP offered his testimony to show that the site contained vegetation and animal species consistent with barred owl habitats. For example, for wetland area D, a DEP employee reported on the vernal habitat sheet that he found the following plant species: red maples, oaks, sweet gum, pitch pine, highbush blueberry, American holly, and green briar. He also observed several animal species, including an adult eastern spadefoot toad, northern spring peepers, and fowlers toads. Another DEP employee reported finding southern leopard frogs, a box turtle, and hundreds of tadpoles. In all, approximately ten or twelve different species of amphibians and reptiles were found in the wetlands on the site. Based on this information, Heilferety concluded that the site has a "diverse community of amphibians," some of which are "very site tenacious" and thus would return to the vernal wetlands for breeding.
Laurence Torok, a DEP employee, and an expert in resource classification of freshwater wetlands and identification of threatened and endangered species, had drafted the DEP's protocols for wetlands resource value classification. See LARRY TOROK, NJDEP, PROTOCOLS FOR THE ESTABLISHMENT OF EXCEPTIONAL RESOURCE VALUE, WETLANDS PROTECTION ACT, (N.J.S.A. 13:9B-1 ET SEQ.) BASED ON DOCUMENTATION OF STATE, OR FEDERAL ENDANGERED OR THREATENED SPECIES 2004) http://www.state.nj.us/dep/landuse/protocols.pdf.[3] He explained that under N.J.S.A. 13:9B-7(a), the wetlands on the property are considered as having exceptional resource value because they provide a documented habitat for threatened or endangered species; and the site remained suitable for resting and feeding by the barred owl, who feed on the small mammals and amphibians found on the site.
Torok defined a documented habitat as "an area for which there is recorded evidence of past use by threatened or endangered species." In determining whether the site contained evidence of past use by the barred owl, Torok utilized the DEP's Landscape Project mapping, N.J.A.C. 7:7A-2.4(c), which uses species sightings in conjunction with their known habitat characteristics, and a vegetative overview, to generate habitat mapping of threatened or endangered species. Based on DEP records, Torok claimed that several documented sightings of barred owls were made in close proximity to appellant's site.
*873 Pursuant to its protocol, the DEP used a one-mile radius around the sighting to designate an approximation of the home range for the species. The sightings were then plotted on an aerial photograph and incorporated into the landscape mapping. Appellant's property fell within the documented home range of a barred owl sighting, and it was within the large forested wetland area considered to be barred owl habitat. Torok said that the entire site was also in the one-mile range of Lomax's recorded sightings of owls to the south of the site. The site was surrounded by a heavily forested block, and the mapping showed evidence of past use.
Next, Torok assessed the property to determine whether it remained a suitable habitat for barred owl feeding and resting. During his inspection of the property on April 23, 2003, he found that the forested wetlands had a canopy of trees and areas of open and dense underbrush, rendering the site "a very good" habitat for barred owl foraging. The small field was home to a variety of small mammals upon which the barred owls, who were omnivorous, would feed. The owls also would feed on the extensive supply of amphibians in the vernal pools, an important seasonal food source that was not available throughout the entire forest surrounding the site. Some of the vegetation on the site, notably holly and pitch pine, were barred owls' favored winter roosts.
Torok admitted that the site was located within an area that had been fragmented by surrounding development, that noise can affect the manner in which the barred owl hunts for prey, and that the presence of people generally has a negative impact on the suitability of the habitat for barred owls. Nonetheless, he maintained that barred owls "have a certain threshold of tolerance of development," and the fragmentation and level of disturbances do not render the site an unsuitable habitat for seasonal resting and feeding.
He explained that the radio tower to the east of the site was located in a field, an area not generally used by the barred owl for foraging. The owls could easily fly over it to access the wetlands on appellant's property, and the presence of the light on the tower presented "a relatively minor level of disturbance."
He asserted that the train tracks and ATV trails to the east of the site represented an inconsistent, and therefore minor, disturbance. In fact, Torok noted that Lomax's control site, where barred owls were found, was located closer to the train tracks and ATV trail, thereby confirming that the noise generated by these activities did not affect the owls.
Likewise, Goshen-Swainton Road, located to the north of the site, did not, in Torok's opinion, constitute a deterring disturbance because the road was essentially a "single-lane" road, with seasonal differences in traffic patterns. And the campground located to the west of the property was also a cause of only seasonal disturbances. Torok explained that barred owls use different habitats at different times of the year, and the areas that they use for breeding may not be the same areas they use for foraging. Appellant's site lent itself to such seasonal use because the vernal pools contained a large quantity of prey in early spring, and thus would be a good foraging habitat for barred owls.
Torok admitted that the lights from the parking lot of the veterinarian's office located on the northern boundary of the property might have a negative effect in the immediate vicinity of the lot, but claimed they would have a negligible effect on the wooded wetlands on the site. He further asserted that he "did not see a collective level of disturbance that [would] render the wetlands unsuitable for use *874 during other times of the year, perhaps outside the breeding season."
Torok acknowledged that no barred owls had ever been sighted on the property, which he attributed to "the nature of the species," making it difficult to find. He opined that Lomax's failure to entice the owls onto the property during the months of April, May and June did not preclude the owls' use of the on-site wetlands during other times of the year, especially the winter and early spring. He maintained that barred owls generally will not follow a call "off of their breeding territory," and thus the calling technique is ineffective in identifying seasonal use, such as foraging and resting. And, in fact, Torok testified that appellant's site is suitable for "more of a seasonal use for foraging, roosting and resting."

D. The ALJ's Findings
The ALJ rejected appellant's argument that the DEP did not have statutory authority to regulate threatened species. Nevertheless, he reversed the denial of the No. 6 permit concluding that appellant's site was only of intermediate resource value because the freshwater wetlands on appellant's property were not suitable barred owl habitat due to fragmentation, human activity, and preexisting development. He found that although the evidence documented past use by barred owls on the site, the site was "significantly fragmented" by the surrounding housing, lighting, campground, commercial structures, and busy connector roads, and he agreed with Lomax that these disturbances dramatically deterred the barred owl from utilizing the site. The ALJ's findings included the following:
[Appellant] based its conclusions upon extensive, site specific, in-person investigations spanning over four years. Conversely, [the DEP] relied substantially upon prior recorded evidence of others sometimes, dating back many decades. Consequently, the factual findings in this matter depend largely on an analysis of extensive on-site investigations offered by [appellant] vs. historic documentation offered by [the DEP].
....
Lomax performed substantially more research than [the DEP]. Consequently, [appellant's] research was more convincing. In-person site inspections over four years substantially outweigh historic recorded evidence of past sightings.
....
It was undisputed that the site is not present habitat. There was no evidence adduced that the site was in use by the barred owl and no eaten food, feathers, or carcasses [were found]. My findings are based upon the "ground truthing" testimony by Lomax and the DEP protocols. It is not based solely on the lack of sightings of the barred owl on site. I am mindful that the lack of any sightings alone is insufficient to conclude that a site is not suitable habitat.
Both parties filed exceptions. The DEP contested the ALJ's findings as to the suitability of the habitat, and appellant challenged the ALJ's opinion that the DEP had the authority to protect threatened species.

E. The Commissioner's Findings
On July 2, 2007, the Commissioner agreed with the ALJ that the DEP had the statutory authority to regulate threatened species, stating that "[n]othing in [the New Jersey Endangered Species Act] precludes [the] DEP from distinguishing within the category of `endangered species' those species that require immediate assistance and those whose survival or recruitment is in jeopardy, albeit to a lesser degree." The Commissioner rejected the *875 ALJ's rationale for classifying the wetlands as intermediate resource value, and found that appellant "had not carried its burden ... that its freshwater wetlands do not remain suitable barred owl habitat on at least a seasonal basis."
With regard to the ALJ's credibility findings, the Commissioner observed that the DEP's expert witnesses had followed the appropriate methodology by reviewing documented sightings of barred owls in the vicinity of the site. Thus, the Commissioner found that
[t]o conclude that DEP's expert witness is less credible or that his testimony is less worthy of weight than the [appellant's] witness because DEP followed a methodology that was required by law and departmental policy makes little sense. It makes even less sense when the record reflects that [appellant's] investigations over a period of four or more years fully confirm the reliability and continuing viability of DEP's information concerning barred owl sightings in the vicinity of [appellant's] property. The Lomax investigations provide indisputable proof that the immediate environs of [appellant's] 32.5 acre forested wetlands site constitute present documented habitat of the barred owl. This evidence is consistent with the "historic" evidence presented at the hearing on behalf of the Department.
That DEP's Torok did not personally obtain this information through extensive investigations in the field is irrelevant and should not have resulted in a negative assessment of his "credibility," especially when [Lomax] openly acknowledged at the hearing that he had personally and repeatedly confirmed not only that [appellant's] property was located within the environs of a documented barred owl habitat, but that the site was indisputably contiguous with a present barred owl habitat....
The Initial Decision [by the ALJ] speaks in terms of credibility and weight of the evidence. To the extent that "credibility" of a witness means an assessment of "honesty" or "truthfulness," nothing in the Initial Decision suggests that DEP's witnesses were not truthful in their responses on direct and cross-examination. Accordingly, the issue here is the weight to be given the opinions of the parties' experts and whether [appellant], did, in fact, prove by the preponderance of the evidence, that pursuant to the [Wetlands Act] it was entitled to [the permit].
The Commissioner found that the lack of a recent documented sighting of a barred owl on appellant's property did not, as the ALJ found, render it "indisputable that the site is not present habitat." According to the Commissioner, the ALJ appeared to have been influenced by the fact that the documented DEP sightings were "stale," in that they had been recorded in 1984, 1995, and 1999. The Commissioner stated that the "reliability and continuing validity" of those historical sightings "ceased to be an issue in the case" when appellant's expert testified that "on at least five separate occasions between 2003 and 2006, he obtained positive responses from the barred owl" in the contiguous woodlands to the south of the site. Thus,
far from denigrating the importance of DEP's historical data, the [ALJ] should have rejected [appellant's] complaints about DEP's methodology and found that the criticisms, especially in this particular case, were of no evidential value given [Lomax's] ... investigations that confirmed the presence of the barred owl in the immediate vicinity of the subject site, which was DEP's position from the start.

*876 That it was [appellant's] expert who corroborated the continuing validity of DEP's sightings and information from 1984, 1995, and 1999, as applied by Torok to this particular site, cannot be a legitimate basis for concluding that Torok's ultimate opinions about the nature of the on-site habitat warranted less credence than those of [appellant's] expert.
The Commissioner further rejected the ALJ's finding that appellant's evidence deserved "greater weight because it was `ground-truthed' while DEP's evidence was mainly historical." The Commissioner reasoned that the DEP had investigated, or "ground-truthed" the documented evidence, as required by law and departmental procedure, by visiting the site. The Commissioner stated: "[o]ne does not glean from the record" that Lomax "during four years of investigations (most of which were undertaken with litigation in mind) obtained essential habitat information about the subject site that was not obtained by DEP investigators in their considerably fewer visits."
In fact, there was "little disagreement about the physical characteristics of the site and its immediate surroundings." Both parties agreed as to the delineation of the wetlands, and that the typical habitat for this species is forested uplands and wetlands, as exist on appellant's property. It was undisputed that the vegetation on the site was associated with barred owl habitat in southern New Jersey. The Commissioner observed that the DEP investigators ability
to make essentially the same on-site observations in their four or so collective visits as did Lomax in his 47 visits does not signify that DEP's "ground-truthing" was not as compelling as Lomax's or that one should conclude that Lomax's expert opinion as to the suitability of the habitat warrants greater respect. If the number of visits to a site were the criterion upon which to base credibility, DEP, with its very limited human and fiscal resources, would seldom prevail in a contested case.
The Commissioner did not find Lomax's failure to lure the barred owl onto the property during the breeding season worthy of significant weight. The Commissioner found that it was
not proof sufficient to establish that the habitat has been rendered unsuitable for any other periods of the year when the owl is not breeding, but would be foraging and resting. Lomax, for the most part, confined his investigations on site to the months of April, May, and June, and did not attempt to lure the barred owl to the site in September, October, November, December, January, February, and with one exception, in the first three and a half weeks in March. Accordingly, there is no investigative evidence that the owl did not use the site for foraging and resting precisely during those times of much reduced human disturbance when, in Torok's opinion, the barred owl would utilize the site.
The Commissioner observed that Lomax "made no effort to ascertain whether the wetlands are utilized by this species for foraging and resting [in] the off-season," and concluded that appellant had not proved that the wetlands were not suitable habitat for the barred owl "at any time of the year." In addition, the Commissioner observed that
Just as one cannot reasonably conclude that there are no rodents or small mammals in [appellant's] forested wetlands simply because in four years of investigations Lomax never saw a single such creature, one cannot conclude that just because he did not successfully lure the barred owl onto the property during times of greatest human disturbance, *877 that the barred owl never uses the site for foraging or resting. Even at his own control site, where Lomax made documented sightings, his efforts were successful only 75 percent of the time. Torok testified that Lomax's failure to lure the barred owl was not surprising given the nature of the barred owl, the response of which is dependent upon many factors including the manner in which the investigation is conducted.... The barred owl's silence is, accordingly, not necessarily proof of its absence.
The Commissioner thus found inconclusive Lomax's testimony regarding the detrimental human disturbances. For example, the record contained no evidence of the frequency of rail or ATV usage. And, notably, barred owls had been sighted on Goshen-Swainton Road, thereby "putting in question Lomax's insistence that the barred owl rejects areas that are crossed by such roads."

II
We turn now from the record to our standard of review on appeal. An agency decision will not be reversed unless: "(1) it was arbitrary, capricious, or unreasonable; (2) it violated express or implied legislative policies; (3) it offended the State or Federal Constitution; or (4) the findings on which it was based were not supported by substantial, credible evidence in the record." Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Envtl. Prot., 191 N.J. 38, 48, 921 A.2d 1122 (2007). In reviewing a challenged rule, we
give great deference to an agency's interpretation and implementation of its rules enforcing the statutes for which it is responsible. Such deference is appropriate because it recognizes that "agencies have the specialized expertise necessary to enact regulations dealing with technical matters and are particularly well equipped to read ... and to evaluate the factual and technical issues that... rulemaking would invite."
[In re Freshwater Wetlands Prot. Act Rules, supra, 180 N.J. at 488-89, 852 A.2d 1083 (quoting N.J. State League of Muns. v. Dep't of Cmty. Affairs, 158 N.J. 211, 222, 729 A.2d 21 (1999) (internal quotation omitted)).]
"This deference is even stronger when the agency, like DEP in regard to wetlands, has been delegated discretion to determine the specialized and technical procedures for its tasks." In re Authorization for Freshwater Wetlands Gen. Permits, 372 N.J.Super. 578, 593, 860 A.2d 450 (App.Div.2004) (quotation omitted). Thus, "agency rules are accorded a presumption of validity and reasonableness, and the challenging party has the burden of proving the rule is at odds with the statute." In re Freshwater Wetlands Prot. Act Rules, supra, 180 N.J. at 489, 852 A.2d 1083 (citations omitted).
Nevertheless, "[d]espite that deference, a rule will be set aside if it is inconsistent with the statute it purports to interpret." Ibid. (quotation omitted). "[T]he agency may not under the guise of interpretation ... give the statute any greater effect than its language allows." Ibid. (quotation omitted). If the regulation is "plainly at odds with the statute," the court must "set it aside." Ibid. Furthermore, we are not "bound by the agency's interpretation of a statute or its determination of a strictly legal issue." In re Taylor, 158 N.J. 644, 658, 731 A.2d 35 (1999).

III
Applying this standard of review, we begin our discussion with appellant's argument that the DEP exceeded its statutory authority by protecting threatened species.
*878 The Wetlands Act provides for three classifications of wetlands: exceptional, intermediate, and ordinary resource value. N.J.S.A. 13:9B-7. The DEP is required to develop a system for classification of freshwater wetlands based on criteria that distinguish among the three classifications. Ibid. A General Permit No. 6, authorizing regulated activity in a freshwater wetland, cannot be issued if the wetlands are classified as exceptional resource value. N.J.S.A. 13:9B-23b.
The Wetlands Act defines freshwater wetlands of exceptional resource value, in relevant part, as wetlands, "which are present habitats for threatened or endangered species, or those which are documented habitats for threatened or endangered species which remain suitable for breeding, resting, or feeding by these species during the normal period these species would use the habitat." N.J.S.A. 13:9B-7a(2). The act defines threatened or endangered species by a cross-reference to the New Jersey Endangered Species Act and the federal endangered species list, 50 C.F.R. § 17.11, stating that "threatened or endangered species" are either (1) those species identified pursuant to the New Jersey Endangered Species Act, or (2) those species that appear on the federal endangered species list. N.J.S.A. 13:9B-7d. The barred owl is not listed as threatened or endangered on the federal list. 50 C.F.R. § 17.11. We thus turn our attention to the New Jersey Endangered Species Act.
Under that act, the DEP Commissioner is empowered to conduct investigations and develop data regarding habitat requirements and biological and ecological needs for use in developing wildlife management programs, "to insure the continued ability of wildlife to perpetuate themselves successfully." N.J.S.A. 23:2A-4a. On the basis of those investigations and other data, "the [DEP] commissioner may by regulation promulgate a list of those species and subspecies of wildlife indigenous to the State which are determined to be endangered, giving their common and scientific names by species and subspecies." N.J.S.A. 23:2A-4b. Because, however, the New Jersey Endangered Species Act does not expressly define, or give the Commissioner the power to protect, threatened species, as opposed to endangered species, appellant challenges the DEP's regulations protecting threatened species, see infra p. 879, as without statutory authority.
We reject that challenge. The authority to protect threatened species is found in the definition of endangered species in the New Jersey Endangered Species Act. That definition includes:
any species or subspecies of wildlife whose prospects of survival or recruitment are in jeopardy or are likely within the foreseeable future to become so due to any of the following factors: (1) the destruction, drastic modification, or severe curtailment of its habitat, or (2) its over-utilization for scientific, commercial or sporting purposes, or (3) the effect on it of disease, pollution, or predation, or (4) other natural or manmade factors affecting its prospects of survival or recruitment within the State, or (5) any combination of the foregoing factors. The term shall also be deemed to include any species or subspecies of wildlife appearing on any Federal endangered species list....
[N.J.S.A. 23:2A-3c (emphasis added).]
Thus, although the New Jersey Endangered Species Act does not contain a separate statutory definition of "threatened species," the statute protects threatened species, as well as those that are already endangered, by including in its definition of endangered species those species *879 that "are likely within the foreseeable future" to fall within those species whose "prospects of survival or recruitment are in jeopardy." Ibid.
Consistent with that statutory definition, the DEP promulgated regulations in which a threatened species is defined as "a species that may become endangered if conditions surrounding it begin to or continue to deteriorate." N.J.A.C. 7:25-4.1. It further defined an endangered species as "a species whose prospects for survival within the State are in immediate danger due to one or many factors: A loss of or change in habitat, overexploitation, predation, competition, [or] disease. An endangered species requires immediate assistance or extinction will probably follow." Ibid. The DEP has also promulgated regulations that identify both endangered species, N.J.A.C. 7:25-4.13, and indigenous nongame wildlife species, which include threatened species, N.J.A.C. 7:25-4.17, to be protected by the DEP. The latter regulation lists the barred owl as a threatened species.
Put simply, in its regulations implementing the New Jersey Endangered Species Act, the DEP separated the statutory definition of endangered species, N.J.S.A. 23:2A-3c, into two categories: one for species whose present prospects for survival are in immediate jeopardy (endangered), and one for species that may become endangered (threatened). Those categories are encompassed within the statutory definition of endangered species contained in the New Jersey Endangered Species Act, which is specifically incorporated by reference into the Wetlands Act. N.J.S.A. 13:9B-7d. The regulations are valid because they are consistent with the statute they purport to interpret. In re Freshwater Wetlands, supra, 180 N.J. at 489, 852 A.2d 1083. Consequently, the DEP has authority to identify and protect threatened species.
This construction of the legislative scheme is also consistent with the legislative policy underlying the New Jersey Endangered Species Act, which is to "manage all forms of wildlife to insure their continued participation in the ecosystem," and to "accord[] special protection" to endangered species. N.J.S.A. 23:2A-2. It is also in accord with the act's legislative history, which encourages the conservation of natural resources: "In recent years there has been a growing public awareness of the need to conserve scarce natural resources, including wildlife. Wildlife is the common property of all and held in trust by the State for the benefit of all its people." Assembly Agriculture, Conservation and Natural Resources Committee, Statement to A.2151 (February 5, 1975).
Notably, the DEP has historically construed the New Jersey Endangered Species Act to authorize the designation of species on the indigenous nongame wildlife species list, N.J.A.C. 7:25-4.17, as threatened. See, e.g., Citizens United to Protect the Maurice River and its Tributaries, Inc. v. City of Millville Plan. Bd., 395 N.J.Super. 434, 441, 929 A.2d 606 (App. Div.2007) (property contained four threatened species, the pine snake, Cooper's hawk, barred owl and redheaded woodpecker). This historical construction is entitled to great weight. Last Chance Dev. P'ship v. Kean, 119 N.J. 425, 434, 575 A.2d 427 (1990) ("[a]n agency's construction of a statute over a period of years without legislative interference will generally be granted great weight as evidence of its conformity with the legislative intent.").
Appellant argues that the New Jersey Endangered Species Act, nonetheless, is "not nearly as comprehensive" as the "Federal Endangered Species Act," 16 U.S.C.A. §§ 1531-1544, with the "most *880 conspicuous difference between the federal and New Jersey Act [being] that the federal act identified `threatened species' which must be identified and protected according to the terms of the statute, whereas the New Jersey Act fails to even mention `threatened species.'" As appellant correctly observes, the Federal Endangered Species Act and the New Jersey Endangered Species Act were both enacted in 1973, and at least one commentator has noted that the New Jersey act is "modeled after" the federal act. Joan Olawski-Stiener, Paradise Lost: New Jersey's Endangered Species Protection Laws, 22 Seton Hall Legislative Journal 589, 606 (1998).
That said, under the Federal Endangered Species Act, an "endangered species" is defined as "any species which is in danger of extinction throughout all or a significant portion of its range," 16 U.S.C.A. § 1532(6), and a "threatened species" is defined as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C.A. § 1532(20). The New Jersey Endangered Species Act simply combined these definitions under one broad definition of endangered species, N.J.S.A. 23:2A-3c, including both "species or subspecies of wildlife whose prospects of survival or recruitment are in jeopardy or are likely within the foreseeable future to become so." (emphasis added). Thus, as the Commissioner found, the DEP had the authority to protect those species that are in immediate danger (endangered), and those species likely to become so (threatened).

IV
We next consider the Commissioner's decision to deny appellant's application because the wetlands are of exceptional resource value. The burden is on the applicant to demonstrate that the wetlands should not be classified as exceptional resource value. N.J.S.A. 13:9B-7a(2).
In promulgating the Wetlands Act, the Legislature found that "freshwater wetlands provide essential breeding, spawning, nesting, and wintering habitats for a major portion of the State's fish and wildlife, including migrating birds, endangered species, and commercially and recreationally important wildlife." N.J.S.A. 13:9B-2. Freshwater wetlands of "exceptional resource value" are identified as wetlands that
are present habitats for threatened or endangered species, or those which are documented habitats for threatened or endangered species which remain suitable for breeding, resting, or feeding by these species during the normal period these species would use the habitat. A habitat shall be considered a documented habitat if the department makes a finding that the habitat remains suitable for use by the specific documented threatened and endangered species....
[N.J.S.A. 13:9B-7a(2).]
Delineation of wetlands as exceptional resource value is thus "dependent upon DEP's determination that the wetlands area is either a present habitat for a threatened or endangered species or a documented habitat for such species." In re Adopted Amendments to N.J.A.C. 7:7A-2.4., 365 N.J.Super. 255, 261, 839 A.2d 60 (App.Div.2003). N.J.S.A. 13:9B-7a "does not restrict classification of such wetlands to habitats in which an endangered or threatened species either has presently been sighted or has been sighted in the past." Id. at 266, 839 A.2d 60. Instead, "[i]ts focus is upon the habitats of such species and affords DEP broad discretion to document such habitats." Ibid.
*881 The term "present habitat" is not defined. The term "documented habitat" means areas for which:
1. There is recorded evidence of past use by a threatened or endangered species of flora or fauna for breeding, resting, or feeding. Evidence of past use by a species may include, but is not limited to, sightings of the species, or of its sign (for example, skin, scat, shell, track, nest, herbarium records, etc.), as well as identification of its call; and
2. The Department makes the finding that the area remains suitable for use by the specific documented threatened or endangered species during the normal period(s) the species would use the habitat.
[N.J.A.C. 7:7A-1.4.]
The DEP "identifies present or documented habitat for threatened or endangered species . . . using the Landscape Project method, which focuses on habitat areas required to support local populations of threatened or endangered wildlife species." N.J.A.C. 7:7A-2.4(c). The Landscape Project method
uses satellite imagery to determine habitat type. The species data is then overlaid onto habitat maps. Species data are taken in large part from the National Heritage Program's Biological Conservation Database. That database includes DEP on-site research, environmental consultant reports, and information from members of the public. Before being entered into the database, all records are verified and mapped by a staff biologist. Only those sightings mapped to within one second of latitude and longitude that occurred after 1970 are used to identify critical areas.
[In re Adopted Amendments, supra, 365 N.J.Super. at 261, n. 2, 839 A.2d 60.]
The method "uses species sightings in conjunction with their known habitat characteristics, focusing upon actual land cover and land use to generate habitat mapping." Id. at 262-63, 839 A.2d 60. It "provides more flexibility in the classification process by broadening the field of inquiry beyond `sighting-specific' areas to contiguous wetlands containing the sighted species' habitat characteristics." Id. at 263, 839 A.2d 60. The Landscape Project method
broadens the inquiry to include habitats in which there have been actual sightings or other physical evidence of an endangered or threatened species, and contiguous wetlands which contain the natural characteristics that make it suitable for that species to populate. The evident premise is that endangered or threatened species are not stationary. As DEP has found, "[m]any rare species populations require large contiguous blocks of habitat to survive." It is difficult to quarrel with DEP's observation that "[t]he rapid suburbanization of our landscape has led to the loss and degradation of critically important wildlife habitats, and the fragmentation and isolation of the habitats that remain."
[Id. at 266, 839 A.2d 60.]
Using this methodology, the DEP developed protocols for designating freshwater wetlands of exceptional resource value based on documentation of endangered or threatened species. The protocols provide that the "[e]ntire State is considered within [the barred owl's] range," with "[m]ajor populations" located in the "large swamp complexes in Cape May and Cumberland County." PROTOCOLS FOR THE ESTABLISHMENT OF EXCEPTIONAL RESOURCE VALUE, SUPRA. A "suitable habitat" for the barred owl in southern New Jersey includes tracts of Atlantic white cedar swamp, pitch pine lowland, and hardwood swamp. Ibid. The cedar swamp and pitch pine habitats featured "typical understory [vegetation under the trees] vegetation," including highbush *882 blueberry. Ibid. The "overstory" the upper strata of multi-layered plantingtree species in the hardwood swamps include sweet gum, black gum, and red maple. Ibid.
Appellant argues that the Commissioner erred in finding that the property was a documented habitat for the barred owl because the property was devoid of evidence of past use or evidence that it remained a suitable habitat. In support of this argument, appellant contends that the Commissioner "gave undue weight to the hearsay evidence presented by DEP, which the ALJ properly found less convincing and less credible." Appellant is referring to the Natural Heritage Database sightings of the barred owl, made in close proximity to the site in 1984, 1995, and 1999. Appellant concedes that hearsay evidence is admissible in an administrative hearing, but argues that the Commissioner should have placed little weight on these old sightings, and that there was no "residuum" of competent credible findings in support of the final decision.
Subject to the discretion of the ALJ, hearsay evidence is admissible in a contested case. N.J.A.C. 1:1-15.5(a). Nevertheless, "[n]otwithstanding the admissibility of hearsay evidence, some legally competent evidence must exist to support each ultimate finding of fact to an extent sufficient to provide assurances of reliability and to avoid the fact or appearance of arbitrariness." N.J.A.C. 1:1-15.5(b). Here, the record contains legally competent evidence to support the Commissioner's findings. Documented sightings of barred owls were subject to verification under a specific set of protocols set forth in the Landscape Project manual before they were entered in the National Heritage database. Only those sighting reports that are verified and accepted in accordance with the protocols were mapped. All verified sightings were charted on topographical maps of the most recent infrared aerial imagery by a staff biologist prior to entry within the database. Compliance with these procedures established the reliability of the data sufficient for the evidence to be admissible.
What is more, as the Commissioner found, the reliability of these historical sightings "ceased to be an issue in the case" when Lomax testified that "on at least five separate occasions between 2003 and 2006, he obtained positive responses from the barred owl" in the contiguous wetlands to the south of the site. These findings corroborated the continued reliability of the historical sightings. Therefore, the ALJ properly admitted the sightings into evidence, and the Commissioner was entitled to rely on them in rendering a decision.
Appellant next argues that the DEP failed to establish that the property was a "documented habitat," claiming that there was no evidence on the property of past use by the barred owl. As appellant correctly points out, a barred owl has never been sighted on its property, nor has any physical evidence, such as nests or bolusesball-like nestsbeen found on the property. But the DEP need not document the actual presence of the barred owl on the site for that property to be part of a documented habitat. See In re Adopted Amendments, supra, 365 N.J.Super. at 263, 839 A.2d 60; see also Jones v. N.J. Dep't of Envtl. Prot., 2004 LEXIS 1094, at *17 (N.J.Adm.) (site-specific evidence of the presence of an endangered species is not required to sustain an exceptional resource value classification); Dautel v. N.J. Dep't of Envtl. Prot., DEP XXXX-XX-XXXX.2LT, initial decision, (June 8, 1998), WL 658316 (June 8, 1998), http://lawlibrary.rutgers. edu/oal/search.html> ("a species need not be documented on a specific property for *883 that property to be part of a documented habitat"); Shannon v. N.J. Dep't of Envtl. Prot., OAL docket No. ESA 5882-91 (August 19, 1992), (slip op. at 7) (site-specific evidence is not necessary to prove that the property contains a documented habitat for threatened or endangered species).
Instead, the DEP can establish recorded past use of the property by barred owls through off-site observations, provided that the sightings were in close vicinity to the site, were within the home range of the species, and no physical barriers would have interfered with the species' use of the property. See Rossi v. Div. of Coastal Res., 92 N.J.A.R.2d (EPE) 244, 1992 WL 405889; see also Dautel, supra, DEP XXXX-XX-XXXX.2LT, initial decision (June 8, 1998), http://lawlibrary.rutgers. edu/oal/search.html> (denial of General Permit No. 6 where barred owl sighted around petitioner's property, and property was suitable for breeding, resting, and foraging).
Here, Lomax heard an owl calling from 200 feet south of the site. Barred owls are known to travel two miles within their home range. Thus, the barred owl was sighted well within the species's range for foraging and resting. Moreover, Torok identified appellant's wetlands as a component of "a wetlands complex that was: (a) Identified as rank 4 (endangered and threatened species) on the Department's Landscape mapping." This evidence was properly considered by the Commissioner in rendering her decision.
Appellant's next argument is that the development on and surrounding the property fragmented any potential habitat for the barred owl, and that the human disturbance constituted a barrier that interfered with the owl's use of the site. The Commissioner rejected that argument and the record supports the Commissioner's decision. The thirty-two-acre property contained one single-family house, a driveway, and a garage. The property was surrounded by some development, including a veterinary office and a few single family homes to the north, railroad tracks and an ATV trail to the east, and a campground to the west. The campground was used only seasonally, however, and the record does not indicate the frequency of the rail or ATV use. These seasonal disturbances would diminish during the late fall, winter, and early spring, when the barred owl would use the property for foraging and resting. Significantly, barred owls had been sighted on Goshen-Swainton Road, and in close vicinity to the train tracks and ATV trails, tending to show that noise generated by these activities did not interfere with the owls' range.
That barred owls were never sighted on the property does not prove that human disturbances rendered the property unsuitable as a barred owl habitat because both parties substantially concede that the shy, nocturnal species is very difficult to find. As to the use of recorded owl calls to attract barred owl species, that technique is most appropriate when they are most likely to respond, namely, during breeding season. But, as Torok testified, the barred owls were using the property for foraging and resting, not breeding, and thus the calling technique would not have been effective in luring barred owls to the site. Unless the technique was used during breeding season, it would not have generated "a territorial response."
Next, appellant argues that it established that the property was not a suitable habitat for the species, in that the wetlands were small, fragmented, and did not contain the type of vegetation that typifies the species' habitat. The Commissioner disagreed, and her decision was supported by the record. There was ample, *884 undisputed evidence that this large tract of property was primarily forested, with varying degrees of underbrush, and comprised a component of an extensive wetlands area. The vegetation on the property was consistent with known barred owl foraging and resting habitats in southern New Jersey, as it contained red maple, oaks, sweet gum, pitch pine, American holly, highbush blueberry, and green briar, some of which, including the holly and pitch pine, were favored winter roosts of the species. The property also contained an ample food supply, notably, an extensive supply of amphibians in the vernal pools, and a variety of small mammals.
The Landscape Project method broadens "the field of inquiry beyond `sighting-specific' areas to contiguous wetlands containing sighted species' habitat characteristics." In re Adopted Amendments, supra, 365 N.J.Super. at 263, 839 A.2d 60, In fact, the Landscape Project method seeks to avoid additional fragmentation of habitats, a result that would occur if appellant obtained the permit and developed the property.
Nor, as appellant argues, did the DEP simply rely on its Landscape Project maps to support its conclusion that the property was a documented habitat for the barred owl, although the maps are an authoritative source, In re Adopted Amendments, supra, 365 N.J.Super. 255, 839 A.2d 60, and the facts contained in the maps were verified. Even though the initial determination as to whether the property was a documented habitat for the barred owl was based on the Landscape Project mapping, the DEP's analysis did not end there. Torok explained that he first looked to the Landscape Project mapping to determine whether barred owls had been sighted in the vicinity of the property, and to determine whether the property was in the documented range of the species. Then, he conducted a site inspection of the wetlands on the property, observing the type of vegetation and animal species on the site. Based on this inspection, he verified that the property remained a suitable habitat for barred owl foraging and resting. Thus, the DEP did not rely solely on the Landscape Project mapping.
We next address appellant's argument that the Commissioner erred in rejecting the ALJ's findings on credibility. An ALJ is charged with issuing a decision that contains recommended findings of fact and conclusions of law that are "based upon sufficient, competent, and credible evidence." N.J.S.A. 52:14B-10(c). The ALJ's decision is then reviewed by the agency. N.J.S.A. 52:14B-10(c). The agency head may not, however,
reject or modify any findings of fact as to issues of credibility of lay witness testimony unless it is first determined from a review of the record that the findings are arbitrary, capricious or unreasonable or are not supported by sufficient, competent, and credible evidence in the record. In rejecting or modifying any findings of fact, the agency head shall state with particularity the reasons for rejecting the findings and shall make new or modified findings supported by sufficient, competent, and credible evidence in the record.
[N.J.S.A. 52:14B-10(c) (emphasis added).]
As this court has previously explained, the agency is "not at liberty to simply substitute its judgment for that of the ALJ's." Cavalieri v. Bd. of Trs. of the Pub. Employees Ret. Sys., 368 N.J.Super. 527, 534, 847 A.2d 592 (App.Div.2004).
Here, the Commissioner did not violate these tenets. First, Lomax and Torok were experts, not lay witnesses. Their testimony was therefore not subject to the constraints of N.J.S.A. 52:14B-10(c). But *885 more significantly, the Commissioner emphasized that no material facts were in dispute where credibility was a pertinent factor. The types of development on and surrounding the property, the nature of the vegetation, the types of mammals and amphibians on the property, and delineation of the wetlands on the property, were not in dispute. Nor was the credibility of the witnesses, in the sense of their truth or veracity, in dispute. The dispute centered on the nature of the parties' investigation, notably, an intensive on-site survey by appellant, as compared to the DEP's review of Landscape Project mapping, a methodology implemented through regulation, and its limited on-site survey.
In rejecting the ALJ's conclusion that appellant's methodology was more compelling than the DEP's, the Commissioner stated with particularity her reasons for doing so, explaining "why the ALJ's decision was not supported by sufficient credible evidence or was otherwise arbitrary." Cavalieri, supra, 368 N.J.Super. at 534, 847 A.2d 592. The Commissioner explained that the DEP's methodology was required by law, and that Lomax's sightings of barred owls in close proximity to the site supported the DEP's recorded owl sightings. Moreover, the Commissioner observed that the record did not show that Lomax, during his four-year survey of the property, had obtained any essential habitat information that had not been obtained by the DEP investigators during their limited visits. The Commissioner stressed that the number of visits to a site cannot form the sole basis on which to base credibility. That is not an unreasonable finding.
Affirmed.
NOTES
[1] Appellant also argues on appeal that the DEP's designation of the barred owl as a threatened species is arbitrary and capricious. We decline to address this issue because appellant failed to raise it before the agency. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973).
[2] A vernal habitat is a wetland meeting various criteria and featuring evidence of different animal species. See N.J.A.C. 7:7A-1.4; N.J.A.C. 7:7A-2.3; N.J.A.C. 7A app. 1.
[3] The DEP protocols were updated on May 13, 2008, but, as to the barred owl, remained substantially unchanged from the 2004 protocols Torok applied to his assessment of this case. The 2008 protocols are available at http://www.state.nj.us/dep/landuse/forms/protocols_5_08.pdf.