**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0513-22

LAURENA STAUB,

     Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
TEACHERS' PENSION AND
ANNUITY FUND,

     Respondent-Respondent.

---

Argued December 12, 2023 – Decided March 8, 2024

Before Judges Rose and Smith.

On appeal from the Board of Trustees of the Teachers' Pension and Annuity Fund, Department of the Treasury.

Arthur J. Murray argued the cause for appellant (Alterman & Associates, LLC, attorneys; Stuart J. Alterman, on the brief).

Jeffrey David Padgett, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant

Attorney General, of counsel; Jeffrey David Padgett, on the brief).

PER CURIAM

Laurena Staub, a retired school psychologist, appeals from a November 2, 2022 final decision of the Board of Trustees (Board) of the Teachers' Pension and Annuity Fund (TPAF), denying her application for accidental disability retirement (ADR) benefits. The Board modified certain factual findings and rejected the legal conclusion of an administrative law judge (ALJ), who had determined Staub was totally and permanently disabled from her employment with the Brick Township Board of Education (BTBOE) as the direct result of an April 30, 2013 incident. We affirm.

I.

We summarize the pertinent facts from the record before the ALJ. During the two-day testimonial hearing, Staub testified on her own behalf and called Gregory S. Rasin, M.D., an expert in psychology, and the Board presented the testimony of its psychology expert, Daniel B. LoPreto, Ph.D. The parties moved into evidence several documents, including the reports and addenda of their experts.

Hired by the BTBOE in 2003, Staub's responsibilities included creating Individualized Education Plans (IEP) and determining whether students

2

qualified for special education services. During the month preceding the incident, Staub, as the case manager for a middle school grade level, determined a particular student ineligible for such services. Thereafter, Staub was contacted "about reevaluating [her] decision."

While Staub was sitting at her desk preparing for the April 30, 2013 reevaluation meeting, one of her supervisors, Special Education Supervisor Andrew Morgan, entered her office, "stood over [her], . . . got really close to [her] face," and stated:

> You're going to go into the meeting. This is your job, you're going to . . . review everything; you're going to make the student eligible for services; you're going to do an IEP, you're going to make him eligible. This is your job; this is what you're going to do.

Staub later testified Morgan said, "this is your life." She thought Morgan "was going to do something bad to [her], maybe he would kill [her], [she didn't] know." To support her inference, Staub stated Morgan "is a person [whom] nobody ever says no to" and that he "had a criminal record," which included an arrest for drugs. Before the incident, Staub "[n]ever had an encounter like that with Morgan or anyone else at the Brick schools." The incident made her feel "terrified" and "horrified."

A-0513-22

Morgan "left [Staub's office] like nothing happened."  Later during the meeting, Staub did not change her ineligibility determination.  "[A]t some point [Staub] thought [Morgan] was actually going to hit [her] because he stood up and was . . . screaming."

Thereafter, her "life was made a living hell."  Staub said she received "death threats on [her] cell phone" but was afraid to file a police report in view of Morgan's criminal record.  Staub also claimed her previously approved accommodations following a 2008 motor vehicle accident were removed.  She also was transferred to another position, for which she was not certified, at another school in the district.  Staub continued to fear for her life.  Eventually, Staub filed a civil lawsuit against Morgan and other BTBOE employees and settled out of court.  Staub also cooperated with the Ocean County Prosecutor's Office, which filed charges against Morgan and others around 2015, based on information she provided.

On cross-examination, Staub stated that she did not quit her job even though she believed Morgan asked her to do something immoral and had threatened her life because she "was blackballed," i.e., "the word was out" that she should not be hired.  Divorced with a child to support, "quitting was not an option."

4

In November 2015, Staub was placed on administrative leave. Following a fitness for duty psychological examination conducted by Robert Berkowitz, M.D., Staub returned to work in June 2016. However, she did not return for the 2016-17 school year or thereafter.

In May 2017, Staub applied for ADR benefits. Following an independent medical examination (IME) conducted by Dr. LoPreto in September 2017, the Board denied Staub's application pursuant to N.J.S.A. 18A:66-39. The Board found Staub "permanently disabled from the performance of [her] regular and assigned job duties" and "the event occurred during and as a result of [her] regular or assigned duties." However, the Board further found "the event that caused [her] disability was not identifiable as to time and place" and "was not undesigned and unexpected"; and her "reported disability [wa]s not the direct result of a traumatic event." The Board thus awarded ordinary disability retirement benefits but denied Staub's application for ADR benefits.

Staub filed an administrative appeal and the matter was transferred to the Office of Administrative Law as a contested case. She testified consistently with the account summarized above.

Dr. Rasin testified that he diagnosed Staub "as suffering from major depressive disorder, single episode moderate, and adjustment disorder with

anxious mood to be permanent in nature."  Although Dr. Rasin did not diagnose Staub with PTSD, he agreed with Staub's treating psychologist, Robbin J. Kay, Ph.D., that "more likely than not [Staub] suffer[ed] from [PTSD]."  Dr. Rasin opined that the April 30, 2013 incident was the "touchstone . . . event, which started . . . Staub's disability."

By contrast, Dr. LoPreto testified Staub's disability was not attributable to the April 13 incident.  Based on his review of Staub's medical records and his IME, Dr. LoPreto concluded "the alleged work harassment . . . began in 2013, around the time [Staub] was asked to falsify some records . . . to get a specific student into special education."  For example, Staub told Dr. LoPreto:  "It was horrible when I returned to work in June, even worse than before.  People were talking behind my back.  They were calling me a whistleblower."  Dr. LoPreto further noted, "after the event of 2013, when this whole thing began to snowball, she was assigned to different schools"; "some of [her] accommodations were no longer met"; "she was going through a divorce at the time"; and "her daughter had some medical problems."  Dr. LoPreto thus opined:  "Staub was suffering from a number of significant psycho-social stressors . . . that she was heroically trying [to] cop[e] with."

A-0513-22

Similar to the other treating and examining doctors, Dr. LoPreto diagnosed Staub with "major depressive disorder, single episode moderate"; "generalized anxiety disorder"; "and adjustment disorder with mixed anxiety and depressed mood." Noting Staub did not express to him that Morgan "actually threatened her with physical harm," Dr. LoPreto found Staub did not meet that criterion for PTSD.

Following written summations, the ALJ issued an initial decision, reversing the Board's denial of ADR benefits. Crediting Staub's testimony, the ALJ noted the Board failed to refute her testimony that Morgan threatened her life and livelihood. Noting both doctors were "good witness[es]," the ALJ found Dr. Rasin more credible, elaborating:

> One key difference in opinion in which Rasin was more persuasive was that Rasin testified that an individual could be mentally disabled without having been diagnosed with PTSD. Further, both doctors concluded that [Staub] suffered from adjustment disorder. Rasin stated that adjustment disorder stemmed from an individual's subjective reaction to exposure to stress, and could not be diagnosed without a qualifying event. LoPreto stated that while an adjustment disorder required a psycho-social stressor, which could be a single incident like a relationship breakup, it could be combination of several problems. LoPreto found multiple causes of [Staub]'s psychological conditions but, again, did not offer any details on how other factors such as [Staub]'s marital

7

situation or her daughter's health served as psycho-social stressors.

The ALJ ultimately found "the [i]ncident with Morgan was the triggering event from which the rest of [Staub's] mental issues flowed." To support his finding, the ALJ noted Staub "believed Morgan threatened her life and livelihood" and "being threatened and intimidated by an administrator at work was not part of [her] normal job duties." Addressing the governing law, the ALJ found Staub "subjectively feared that her life or job was in danger." Further, Dr. Rasin explained "adjustment disorder arose from a person's subjective reaction to stress, and that a psychiatrist would not make such a diagnosis without a qualifying event." The ALJ thus concluded Staub was entitled to ADR benefits.

The Board disagreed, rejecting the ALJ's factual finding that the Board failed to introduce evidence that "other matters were the primary cause of [Staub's] psychiatric issues." Referencing the evidence before the ALJ, the Board found "a variety of stressors . . . contributed to . . . Staub's disabling mental conditions of major depressive disorder, anxiety disorder, and adjustment disorder." That evidence included: the removal of Staub's post-accident work-place accommodations; Dr. LoPreto's testimony that Staub

8

"suffered 'three years of workplace harassment'"; and Staub's disclosure to Dr. LoPreto that she was managing a divorce and her daughter's medical problems.

The Board also rejected the ALJ's legal conclusions, finding instead the incident neither was "terrifying nor horror-inducing" within the meaning of Patterson v. Board of Trustees, State Police Retirement System, 194 N.J. 29 (2008), nor "a traumatic event" pursuant to Richardson v. Board of Trustees, Police & Firemen's Retirement System, 192 N.J. 189 (2007). Further, the Board was not persuaded Staub's disability was "a direct result of the 2013 incident." Citing the Court's decision in Gerba v. Board of Trustees, Public Employees' Retirement System, 83 N.J. 174 (1980), the Board found the ALJ's reasoning "unsound . . . because he determined that her supervisor's 'threat' was the 'triggering event' from which 'the rest of [Staub's] issued flowed.'" The Board elaborated:

> The ALJ deemed the other incidents and harassment as insignificant and dismissed them, yet it is clear that . . . Staub was experiencing a series of personal, medical, and professional issues throughout the same time period. Thus, the ALJ was required to consider whether she met her burden of proving that the 2013 incident was "the essential significant or substantial contributing cause" of her disability, or, whether the combined incidents cumulatively caused her disability. Gerba, 83 N.J. at 186.

Noting both experts diagnosed Staub with adjustment disorder and major depressive disorder, the Board found neither condition "require[s] a 'traumatic event' and can arise solely from an individual's subjective negative reaction to almost any situation." Thus, Staub was required to "identify objective evidence in the record to support her finding that the 2013 incident directly resulted in her disability." Citing the "multiple incidents and stressors" contained in the record, the Board was not convinced Staub satisfied her burden.

On appeal, Staub raises three overlapping arguments, essentially contending the Board improperly modified the ALJ's credibility findings and erroneously represented his factual findings. She further contends the Board "overstepped its inherent authority" by rejecting the ALJ's legal conclusions.

II.

Our role in reviewing the final decision of an administrative agency is limited. Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011). We defer "to an administrative agency's exercise of its statutorily delegated responsibilities." Lavezzi v. State, 219 N.J. 163, 171 (2014). We "should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not

supported by substantial evidence." In re Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008). "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006).

"[T]he test is not whether an appellate court would come to the same conclusion if the original determination was its to make, but rather whether the factfinder could reasonably so conclude upon the proofs." Brady v. Bd. of Rev., 152 N.J. 197, 210 (1997) (quoting Charatan v. Bd. of Rev., 200 N.J. Super. 74, 79 (App. Div. 1985)). "Where . . . the determination is founded upon sufficient credible evidence seen from the totality of the record and on that record findings have been made and conclusions reached involving agency expertise, the agency decision should be sustained." Gerba, 83 N.J. at 189. That said, appellate courts review de novo "an agency's interpretation of a statute or case law." Russo, 206 N.J. at 27.

An agency is empowered to reject and modify an ALJ's initial decision, but its authority to do so is not boundless. When an agency rejects an ALJ's decision, regulations require the agency to clearly state the basis for its rejection and cite specific evidence supporting the agency's final decision and

interpretation of the law. N.J.A.C. 1:1-18.6(b). The Board's discretion includes the authority to adopt, reject, or modify the ALJ's findings of credibility of expert witnesses. In re Adoption of Amends. to Ne., Upper Raritan, Sussex Cnty., 435 N.J. Super. 571, 584 (App. Div. 2014) (citing ZRB, LLC v. N.J. Dep't of Env't Prot., 403 N.J. Super. 531, 561 (App. Div. 2008)). However, "[t]he agency head may not reject or modify any findings of fact as to issues of credibility of lay witness testimony unless it is first determined from a review of the record that the findings are arbitrary, capricious or unreasonable or are not supported by sufficient, competent, and credible evidence in the record." N.J.S.A. 52:14B-10(c).

The TPAF provides for both ordinary, N.J.S.A. 18A:66-39(b), and accidental, N.J.S.A. 18A:66-39(c), disability benefits. "[An ADR] entitles a member to receive a higher level of benefits than those provided under an ordinary disability retirement." Patterson, 194 N.J. at 43. In Richardson, our Supreme Court held that an individual seeking ADR benefits through a government retirement system must establish:

> 1. that [the member] is permanently and totally disabled;
>
> 2. as a direct result of a traumatic event that is
>
>> a. identifiable as to time and place,

b. undesigned and unexpected, and

c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);

3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;

4. that the disability was not the result of the member's willful negligence; and

5. that the member is mentally or physically incapacitated from performing his [or her] usual or any other duty.

[192 N.J. at 212-13.]

The Court defined a "traumatic event" as "essentially the same as what we historically understood an accident to be—an unexpected external happening that directly causes injury and is not the result of pre-existing disease alone or in combination with work effort." Id. at 212.

The following year, in Patterson, the Court clarified that a member who has suffered a "permanent mental disability as a result of a mental stressor, without any physical impact," must meet an additional requirement to qualify for ADR benefits. 194 N.J. at 33. The Court held:

The disability must result from direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or

a similarly serious threat to the physical integrity of the member or another person. By that addition, we achieve the important assurance that the traumatic event posited as the basis for an [ADR] pension is not inconsequential but is objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury.

[Id. at 34.]

The Court cited examples of members able to "vault the traumatic event threshold" predicated on a mental disability due entirely to mental stressors, including "a permanently mentally disabled policeman who sees his partner shot; a teacher who is held hostage by a student; and a government lawyer used as a shield by a defendant." Id. at 50. However, the Court concluded the petitioner police officer, who claimed his sergeant verbally abused him in the presence of other officers, id. at 34-35, failed to meet his burden, id. at 51. The Court elaborated:

Although the conduct of his superiors was cruel, it simply did not involve actual or threatened death or serious injury to Patterson's physical integrity and thus failed to vault the traumatic event threshold. It may be that Patterson could have maintained a different cause of action against his employers, but accidental disability was not the proper vehicle for redress.

[Ibid.]

14

Conversely, in a companion case, the Court concluded the petitioner could satisfy entitlement to ADR benefits where "his disability was a direct result of the threats against his wife and daughter . . . by a presumed gang member who knew where [the petitioner] lived and worked." Id. at 53. The Court thus remanded the petitioner's matter for further consideration. Ibid.

Thereafter, the Court summarized a two-part analysis in cases of permanent mental incapacity resulting from "an exclusively psychological trauma." Mount v. Bd. of Trs., Police & Firemen's Ret. Sys., 233 N.J. 402, 426 (2018). Specifically,

> The [Board or reviewing] court first determines whether the member directly experienced a "terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person." If the event meets the Patterson test, the [Board or reviewing] court then applies the Richardson factors to the member's application.
>
> [Ibid. (quoting Patterson, 194 N.J. at 50).]

Against these governing principles, we conclude the "credible evidence on the record as a whole," R. 2:11-3(e)(1)(D), supports the Board's decision rejecting the ALJ's legal determination that Staub experienced a traumatic event pursuant to Patterson's threshold requirement. The Board considered Staub's

15

claim that Morgan demanded she change the student's eligibility for IEP services and that she felt threated by Morgan's accompanying statement, "This is your life at stake, this is your livelihood at stake." However, the Board deemed the statement "vague" and found it failed to "rise to the level of a terrifying or horror-inducing event within the context of Patterson."

As to Staub's resultant mental injury, we agree with the Board that the incident does not become "traumatic" based on Staub's "subjective[] fear that her life or her job was in danger," as the ALJ found. Rather, as the Board correctly stated, the Patterson standard is objective, not subjective. 194 N.J. at 49-50 (holding "the traumatic event [must] be objectively capable of causing a permanent, disabling mental injury"). Because Staub did not meet the Patterson standard, we need not address whether her claim satisfied the Richardson test.

To the extent we have not addressed a particular argument, it is because either our disposition makes it unnecessary, or the argument was without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We simply add the Board did not alter the ALJ's credibility findings. Instead, the Board's decision was based on its accurate interpretation of the applicable legal principles.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0513-22